THOMAS C. GREENE, RECEIVER, vs. THE A. & W. SPRAGUE MANUFACTURING COMPANY AND OTHERS.

A conveyance made for the benefit of assenting creditors cannot be impeached for fraud by an assenting creditor, who had knowledge of the facts.

A manufacturing corporation executed a deed of its property to a trustee for the benefit of such of its creditors as should accept extension notes secured by it. A savings bank which was a creditor voted to accept the extension notes to be held as collateral to the original notes and to grant the extension, receiving at the same time a considerable sum as semi-annual interest in advance. A large number of other creditors took like action. Held that it could not afterwards repudiate its acceptance of the benefit of the deed and attack it for fraud.

The deed described certain of the property conveyed as "all the property which the parties of the first part have in the following towns in the state of Connecticut, viz.:" (naming four towns.) All parties understood what property was meant and that it was intended that it should pass by the deed. Held that every creditor accepting the benefit of the deed would be regarded as assenting to it as they all understood it.

If necessary, upon amended pleadings, the court would allow a correction of the deed.

The deed contained a provision that the trustee might take possession of the granted property and manage and control it, and might sell it at public or private sale, and should sell upon a request in writing of one fifth of the assenting creditors in amount. Held that this was a contract to which the savings bank, by accepting the deed, became a party, and by which it was bound.

The trustee having taken possession of the property embraced in the description in question had expended a large sum upon it in repairing damage done by a flood. Held that it would be entirely inequitable, after this expenditure, for the savings bank to be allowed to appropriate this property to itself, leaving the general property to bear the burden of the outlay.

The savings bank was, under its charter, managed by a board of trustees. This board had voted to accept the extension notes under the deed. Held that it was no objection to the validity of their action, so far as other parties were concerned, that the board had been irregularly elected. They were the only persons authorized or assuming to act for the corporation, and were trustees de facto.

There was a sufficient consideration for their assent to the deed in the benefits offered by it.

And as other creditors joined with them in accepting the deed, each creditor being presumably influenced by the action of the others, they could not set up, as against them, either the irregularity in the election of their own officers, or the want of a valuable consideration.

Greene *v.* Sprague Manufacturing Co.

At the time when the trustees took the action in question the savings bank had suspended payment and was in an embarrassed condition, and its affairs had been investigated and reported on by a committee appointed by the governor of the state, but no receiver had been appointed. Held that it still remained the duty of the trustees to use their best judgment in managing its affairs, and that they had the power to accept the provisions of the deed.

A receiver of the savings bank was soon after appointed. Held that he could not repudiate the action of the trustees in accepting the deed.

A receiver can repudiate acts of a corporation that are in violation of law and in fraud of creditors; but these are exceptions to the general rule and it should clearly appear that the case is within the exception.

The trustees were not to be regarded as assenting to a fraudulent deed merely because it was so under our law. The transaction took place in the state of Rhode Island, where all the parties resided; the trustees derived all their power from and were amenable to the laws of that state, and the highest court of that state had since decided that the deed was not fraudulent. In these circumstances the validity of their action could not be affected by the different laws of other states where some of the property which the deed assumed to convey was situated.

The fraudulent character of the deed was wholly in its operation to delay creditors in the collection of their debts and appeared on the face of the deed itself. Held that the finding of the court below that the deed was fraudulent was to be considered as a conclusion of law upon the facts.

It appeared by the deed that the grantors sought to secure by it an extension of their indebtedness with a view to the continuance of their business by the trustee, thereby saving the property from a ruinous depreciation and securing ultimate full payment to the creditors with interest, with a return of whatever surplus should be left to themselves. Held not to be a case of actual fraud, and that, as a benefit to assenting creditors was intended by the grantors and expected by the creditors, an assent to it was not to be treated as an assent to a fraudulent deed.

And held that the assent to the deed was not coupled with an implied condition that all the creditors should accept it. The deed being in express terms for those creditors only who assented, it was necessarily implied that some might refuse their assent.

Where a conveyance is in terms for the exclusive benefit of those creditors who assent, an assenting creditor is not absolved from his assent by reason of the danger that non-assenting creditors may break the trust or trench upon the estate.

The non-payment of the extension notes within the time limited did not operate to absolve the savings bank from all obligation growing out of its assent. The whole property having been conveyed to a trustee as security for the extension notes and a large number of other creditors having assented, it would be a wrong to them if any single creditor could, on non-payment of the notes, break up the trust and attach and secure to himself a portion of the trust property.

Greene v. Sprague Manufacturing Co.

Before the trustees voted to accept the benefit of the trust deed, the
    grantors made an assignment of all their property, including the equity
    of redemption in the property principally conveyed, to the same trus-
    tee, for the benefit, first, of the creditors assenting to the original deed,
    and secondly, for all other creditors ratably.   Held that by this assign-
    ment the grantors surrendered the right, originally retained, to possess,
    control and use the property, and that the trustees of the savings
    bank, in assenting to the deed, were to be regarded as assenting to it
    as thus qualified.

And held that, in assenting to the original trust deed, after the assignment
    had been made, they would be considered as assenting to the assign-
    ment.

It was no objection to such a presumed acceptance that the assignment
    was voidable.   It was not void.   No presumption will give effect to a
    void deed, while it may to one that is only voidable.

And there would seem to be no reason why the rule should not apply, that
    the acceptance of a beneficial deed will be presumed.

(Two judges dissenting, and holding that the trustees of the savings bank
    had no right in the circumstances to assent to the deed, that the re-
    ceiver had a right to repudiate their act, that the trust deed and assign-
    ment were fraudulent and void, and that the former could not convey
    a title in this state by reason of the insufficient description of the
    property here.)

[Argued October 23d, 1884—decided April 25th, 1885.]

Suit to foreclose a judgment lien, to set aside or postpone
a trust mortgage and assignment in insolvency, and for
possession of the premises covered by the lien; brought to
the Superior Court in New London County; being the
same case brought before this court upon a demurrer to the
complaint, at its October term, 1881, and reported in 49
Conn. R., 282.   De Wolf, the plaintiff in the case at that
time, had since died, and the present plaintiff had been
appointed receiver in his place, and had entered in the suit.
The court, at the former hearing, overruled the demurrer,
and held the complaint sufficient.   The case was afterwards
tried upon issues of fact made upon the answer of the de-
fendants and replication of the plaintiff, and the following
facts found by the court.

The Franklin Institution for Savings, of which the origi-
nal plaintiff sued as receiver, was incorporated by the Gen-
eral Assembly of the state of Rhode Island (under another
name, afterwards legally changed to its present one) in the

year 1855, with the ordinary rights and powers of a savings bank. The charter contained the following provision with regard to its management:—

"The affairs of said corporation shall be managed by a president, three vice-presidents, and fifteen directors, who, together, shall constitute the board of trustees aforesaid. They shall have power to elect a treasurer, secretary, and such other officers as they may deem expedient, and to fill all vacancies in their board which may happen during the year. In electing treasurer, secretary, or other officers, or in filling vacancies in their own board, there shall be present at least seven of the board, including either the president or one of the vice-presidents. They shall meet at least twice in every year, and as much oftener as they may deem necessary; and also whenever the president or any two directors shall require it; and it shall be the duty of the treasurer to notify such meetings, either by personal notice, or by advertisements in one of the newspapers printed in Providence; and at all meetings of the board of trustees, except for the election of officers as aforesaid, five members shall make a quorum. It shall be the duty of the board of trustees to cause the moneys deposited to be invested in some public stocks, in bank or other stocks, or in private securities, according to law, at the discretion of the standing committee of the board. The members of the board shall not receive any emolument for their services, nor shall any money be loaned to either of them. Any member of the board who shall be present when any loan to a member shall be made, and shall not at that time cause his protest to be entered in writing on the records of the proceedings of the board, against the same, shall be considered and held liable for the amount of every such loan in his individual person and property. The members of the board (except as aforesaid) shall not be responsible for any losses which may happen from whatever cause, except their willful, corrupt misconduct, in which case those only who were present and guilty of such misconduct shall be responsible for the same. The board of trustees, at any

meeting at which seven members at least are present, may appoint a standing committee of not less than three of said board, who may, under the general regulations and by-laws established by said board, superintend the deposits and negotiate the loans made by this corporation; and the said board may, seven at least being present, and after notice of such intention at some previous meeting of such board, make such other and further rules, regulations and by-laws, or alterations of those already made, as they may think expedient; the said corporation having the right, at any regular meeting thereof afterwards, of disallowing the same."

The A. & W. Sprague Manufacturing Company was chartered by the General Assembly of the state of Rhode Island in the year 1862, the original corporators being Byron Sprague, William Sprague and Amasa Sprague. In the year 1873, at the time of the transactions to be stated, the stockholders were the said William Sprague and Amasa Sprague, and Fanny and Mary Sprague. The company had the usual powers of a manufacturing corporation, and was located in Providence, Rhode Island. Between the 28th day of April and the 20th day of October, in the year 1873, the Franklin Institution for Savings discounted for the A. & W. Sprague Manufacturing Company twenty-eight bills of exchange for various sums of money, amounting in the whole to $670,000, all of which bills were drawn by the A. & W. Sprague Manufacturing Company on Hoyt, Spragues & Co., (a co-partnership of which William Sprague and Amasa Sprague were members and partners,) and were payable to the order of A. & W. Sprague, a co-partnership consisting of William Sprague and Amasa Sprague and doing business in Providence, and all the bills were endorsed by A. & W. Sprague and accepted by Hoyt, Spragues & Co. And the Franklin Institution for Savings on or about the 4th day of August, 1873, discounted for the A. & W. Sprague Manufacturing Company the promissory note of that company, dated the day and year last aforesaid, for the sum of $57,000, payable six

months after date to the order of Charles Greene and indorsed by Greene. All these bills of exchange and the note were delivered to the Franklin Institution for Savings, and that institution paid to the A. & W. Sprague Manufacturing Company the amount of the same, deducting therefrom such sums for discount and interest as were agreed on by the parties. The bills and note were not paid at maturity and now remain unpaid except as hereinafter stated.

At the time of the discounting of these bills of exchange and of this note by the Franklin Institution for Savings, William Sprague and Amasa Sprague were trustees of the institution. Amasa Sprague was a member of its standing committee to manage its loans and investments, and William Sprague was its president.

On or about the 28th day of October, 1873, the A. & W. Sprague Manufacturing Company were owing debts to the amount of about $8,300,000, which they were unable to pay as they respectively became due and payable, and suspended payment and failed in business. Their property at that time was estimated by a committee designated by representatives of certain banks in Providence, to be worth about $14,000,000; but a considerable portion of it, which was estimated by that committee to be of the value of $8,144,500, consisted of real estate and mills and machinery for the manufacture of cotton, situated in the states of Maine, Rhode Island and Connecticut, which, in the condition of affairs then existing, could not be readily converted into money. The committee, on the 31st day of October, 1873, reported to the banks a detailed statement of the debts, and a detailed estimate of the assets, together with a particular statement of the assets and liabilities of the firm of A. & W. Sprague, and of William Sprague, Amasa Sprague, Fanny Sprague and Mary Sprague, who were stockholders of the A. & W. Sprague Manufacturing Company, and whose private property was liable for the company's debts. The committee also reported that the unsettled condition of financial affairs and business at that

time, and the large amount of obligations of the company maturing during the next ninety days, precluded the possibility of their reporting that the loan of $1,000,000, which the company had applied for to the banks, would enable them to meet their engagements regularly thereafter, and that as, in the event of their failure to do so, the validity of the mortgage which the company had proposed as security for the loan might be questioned, the loan could not, in the opinion of the committee, be safely made. The committee therefore recommended that the A. & W. Sprague Manufacturing Company, and the individual members thereof, mortgage all their property to three trustees, who should practically have all control and management of the entire property, and that these trustees should issue notes to an amount which should fully cover the amount of the indebtedness then existing, having three years to run, and drawing interest semi-annually, at the rate of $7\frac{3}{10}$ per cent. per annum, with the right reserved to pay five per cent. of the indebtedness as often as in their judgment should be practicable. In support of this recommendation the committee expressed the belief that all the creditors would accept the notes, and that if the trustees should have the full authority asked for them, they would be able to avert a great calamity to thousands of operatives, make the mill properties valuable, prevent an immense further shrinkage of values, and pay in full the indebtedness of the A. & W. Sprague Manufacturing Company, together with that of all their depending establishments. And they concluded their report by saying:—"It being the duty of the trustees to convert the property and pay the debts at as early a day as possible, it is not unlikely that the whole indebtedness may be cancelled in much less time than the three years."

The A. & W. Sprague Manufacturing Company and A. & W. Sprague thereupon caused a general meeting of their creditors to be called; and such meeting was held in the city of Providence on the fifth day of November, 1873. A communication was made to this meeting by the company and A. & W. Sprague, of which the following is a copy:—

" To the chairman of the meeting of creditors of the A. & W. Sprague Manufacturing Company and of A. & W. Sprague :—The A. & W. Sprague Manufacturing Company and A. & W. Sprague regret that they are obliged to announce to their creditors that they find themselves unable to meet their maturing obligations. The recent examination into their affairs made by a committee appointed at a meeting of bank officers in Providence, shows that they have a surplus over their just debts of at least eight millions of property, and they confidently believe that if an extension of reasonable length is granted to them they can pay in full all their liabilities and preserve their print-works and a considerable portion of their mill property. They respectfully invite their creditors to designate from their number a committee with whom they can have a free and full conference, for the purpose of devising the best plan for securing the large property in their hands to their creditors, and enabling all claims against them to be satisfied in the shortest possible space of time. The A. & W. Sprague Manufacturing Company and A. & W. Sprague pledge to their creditors their utmost efforts to co-operate with the creditors in the means to the above end which upon conference may be devised.

"*A. & W. Sprague Manufacturing Company*,

"Per AMASA SPRAGUE, *President*.

"A. & W. SPRAGUE."

The meeting appointed a committee of five as requested in the communication, and adopted resolutions as follows :

"*Resolved*, that in the opinion of this meeting it is eminently desirable that the property of A. & W. Sprague, the A. & W. Sprague Manufacturing Company, and the individual incorporators, should be placed in trust for the benefit of all the creditors, and that three trustees, who shall be accepted by a majority of the creditors, shall be appointed to receive this trust.

"*Resolved*, that the committee of five, just elected, be instructed to report a plan of the deed of trust, together with such names, as trustees, as shall be acceptable to themselves and the Messrs. Sprague."

The committee, in conformity with these instructions, reported the names of Rufus Waterman, Amos D. Lockwood and George C. Nightingale for trustees, to hold and administer the property for the benefit of all the creditors; and these persons were approved and agreed upon for those purposes by the A. & W. Sprague Manufacturing Company and A. & W. Sprague and by the meeting of creditors, on the 6th day of November, 1873.

Between the 6th day of November, 1873, and the 28th day of the same month, the draft of a deed of trust in the nature of a mortgage for the conveyance by the A. & W. Sprague Manufacturing Company, A. &. W. Sprague, William Sprague, Amasa Sprague, Mary Sprague and Fanny Sprague, of their property described therein, to the said Waterman, Lockwood and Nightingale, as trustees, upon the conditions and for the uses and purposes therein mentioned, was prepared, and having been approved by the committee of five appointed by the creditors, and by the creditors at a meeting held in the city of Providence, was signed, sealed, witnessed and acknowledged by the A. & W. Sprague Manufacturing Company, A. & W. Sprague, William Sprague, Amasa Sprague, Mary Sprague and Fanny Sprague, on the 28th day of November, 1873.

Messrs. Waterman, Lockwood and Nightingale declined to accept the trust without security against personal liability, and Zechariah Chafee, who consented to act, was substituted as sole trustee, and signed the deed. The deed was delivered to Chafee late on the evening of December 1st, 1873, and put on record early the next morning. It was as follows:

"This indenture, made and entered into this first day of November, A. D. 1873, by and between the A. & W. Sprague Manufacturing Company, a corporation created by the General Assembly of the state of Rhode Island, and transacting business in the city of Providence; William Sprague, of South Kingstown; Amasa Sprague, of Cranston; Mary Sprague, widow of William Sprague, deceased; Fanny Sprague, widow of Amasa Sprague, deceased, of said

Providence, all in said state; and the said Amasa Sprague and William Sprague, as co-partners, doing business under the firm of A. & W. Sprague, as parties of the first part, and Zechariah Chafee, of said Providence, as party of the second part, witnesseth—

"Whereas the said A. & W. Sprague Manufacturing Company, and the said A. & W. Sprague, and said Amasa Sprague and William Sprague individually, are now indebted or under liability, primary or secondary, in divers sums of money to divers persons, amounting in the aggregate to about the sum of fourteen millions of dollars, and which indebtedness and liabilities said parties of the first part are desirous of funding, and securing by the conveyance of their estates and properties to said party of the second part as mortgagee in trust, as hereinafter provided, and which conveyance to him as mortgagee in trust said party of the second part has agreed to, and by signing these presents does accept.

"And whereas, for this purpose and to this end, said A. & W. Sprague Manufacturing Company have executed their sixteen thousand five hundred negotiable promissory notes, all bearing even date with these presents, and made payable to the order of said A. & W. Sprague, and by them indorsed, payable three years from January 1st, 1874, with interest from January 1st, 1874, payable semi-annually at the rate of seven and three tenths per centum per annum till said principal sum is paid, whether at or after maturity, and all installments of interest in arrear to bear interest at the rate aforesaid till paid, but reserving the right to pay said notes before maturity, in installments of not less than five per centum of the principal thereof, and at any time the semi-annual interest becomes payable, principal and interest payable at the place of business of said A. & W. Sprague Manufacturing Company in said Providence, said notes being of the amounts and lettered and numbered as follows, to wit: [describing them]. And all of which notes have been placed in the hands of said party of the second part, to be by him used and applied to the payment

or retiring of such of the present outstanding indebtedness and liabilities aforesaid as the holders thereof shall, within nine months from the date of these presents, bring in and surrender and discharge, or agree to extend for the term and according to the provisions of said notes; said notes. as so issued by said trustee, to be countersigned by him:

"And whereas the preservation of the manufacturing properties of said A. & W. Sprague Manufacturing Company, and the best interests of the creditors, require, to prevent great loss and shrinkage, that the business of the mills and print-works shall in the meantime be continued:

"Now, therefore, said parties of the first part, in consideration of the premises and of the trusts hereinafter declared, and in further consideration of one dollar to them paid by said party of the second part, the receipt of which is hereby acknowledged, do hereby give, grant, bargain, sell and convey unto the said party of the second part, his heirs, executors, administrators and assigns, all the property, real, personal and mixed, not exempt from attachment by law, which the parties of the first part, or any or either of them, have and hold in the following city and towns in the state of Rhode Island, viz.: the city of Providence, the towns of Cranston, Johnston, Coventry, East Greenwich, West Greenwich, South Kingstown, Warwick, Pawtucket, Lincoln,.North Providence, Cumberland, East Providence and North Kingstown; in the following towns of the commonwealth of Massachusetts, viz.: Attleborough and Palmer; in the following counties of the state of Maine, viz.: Somerset, Piscataquis, Franklin, Kennebec, Penobscot and Aroostook; in the following counties of the state of New Hampshire, viz.: Grafton, Coos, Carroll and Belknap; in the towns of Richmond and Lexington in the state of South Carolina; in the city of Washington in the District of Columbia; in the following towns of the state of Connecticut, viz.: Sterling, Sprague, Scotland and Windham, including in what is known as the Baltic mill property in said state of Connecticut [sundry articles of machinery specified]; and including, generally, within the foregoing description, the

two homestead estates, the Washington and Cove street lot, the Dwyer street lot, the Dorrance street lot, the Pine and Page street lot, the Peace street lot, the Marine Railway property, the lot on the corner of Hope and Waterman streets, the Fenner avenue lot, the Martin street property, the George, Pitman and Ives streets property, the Elmwood store property, the ninth ward property in the city of Providence; the Cranston Print Works property with about eighteen hundred and seventy acres of land and improvements thereon, in the town of Cranston; the Natick Mills property with about eight hundred and thirty acres of land and improvements thereon, and the Ladd farm with about one hundred and one acres of land and improvements thereon, sometimes called the Coweset estate, in the town of Warwick; the Morgan Mill property with about six hundred and twenty-five acres of land and improvements thereon, in the town of Johnston; the homestead estate in South Kingstown, with about four hundred and twenty-eight acres of land and improvements thereon; the mill property in Augusta, Maine, with about four hundred acres of land and improvements thereon; the mill property in Palmer, Massachusetts, with about seven acres of land and improvements thereon; the estates in the city of Washington, with about six acres of land and improvements thereon; the property in the city of Columbia, in the state of South Carolina, with about four hundred acres of land and improvements thereon; and also all other the estate and property, real and personal, of every name and nature, not exempt from attachment by law, wherever situate, and by whatsoever muniments of title evidenced, which any or either of the parties of the first part have, or may be entitled to, in possession or action, reversion or remainder; together, also, with all goods, stock, and supplies, manufactured, unmanufactured, and in process of manufacture, and all fixtures, machinery, tools, and other personal property of every kind, which said A. & W. Sprague Manufacturing Company may at any time, or from time to time, hereafter have, either in lieu of or in addition

to those now on hand; but excepting from this conveyance all shares of capital stock, in any and every corporation wherever located, belonging to any or either of the parties of the first part, the same to be transferred to said party of the second part, upon his request in writing, by way of pledge and collateral security, to secure the performance of the conditions of this instrument.

" To have and to hold said granted and bargained premises, with all the rights, privileges and appurtenances thereof, unto and to the use of him, the said party of the second part, his heirs, executors, administrators and assigns, in trust for the intents and purposes, and with, under and subject to the powers and provisos hereinafter contained, but subject, nevertheless, to the following condition, that is to say:

" Upon condition that if said parties of the first part, or any or either of them, their heirs, executors, administrators or assigns, or any person for them or in their behalf, shall well and truly pay or cause to be paid all and singular the debts and liabilities aforesaid which shall be brought in under these presents, and remain outstanding as hereinbefore provided, and all expenses and liabilities of every kind incurred in the execution of the trusts hereinafter created or declared, and all the notes aforesaid that shall be issued by the trustee aforesaid, together with the interest thereon according to the tenor thereof, then this deed shall be and become void, otherwise shall remain in force.

" And, subject to the condition aforesaid, in trust for said party of the second part, and other the trustees or trustee under these presents for the time being, to stand seized and possessed of the said granted estates and premises, and until default shall be made in the performance of the conditions aforesaid, or any part thereof, or breach shall be made of any of the covenants or agreements hereinafter contained on the part of said parties of the first part to be kept or performed, or until sale under the trust hereinafter declared, or until entry under the power in that behalf hereinafter contained, to permit and suffer said par-

ties of the first part to retain the possession and use of said granted premises.

"Provided, and it shall be lawful for said trustees or trustee for the time being, at any time, or from time to time, before such default or breach, or with or without previous entry, in their or his discretion, to sell at public or private sale any part or parts of said granted estates and property, and to execute and deliver such deed or deeds as may be necessary or proper to vest in the purchaser or purchasers thereof an absolute and indefeasible estate in fee simple therein, and to stand seized of all the purchase moneys to arise and be received therefrom for the uses and purposes hereinafter declared respecting the same.

"And provided further, that said trustees or trustee for the time being may, at any time, or from time to time, before default or breach as well as after, enter upon said granted estates and property, or any part or parts thereof, and take and assume the full and absolute possession and control of the same, and in their or his discretion continue to run and operate or to close the mills or print-works of said manufacturing company or any or either of them, as said trustees or trustee for the time being shall deem for the best interests of the creditors.

"And provided also, and it is hereby further declared, that in case default shall be made in payment of said notes hereby secured, or any or either of them, or of the semi-annual interests due thereon, or breach shall be made of either of the covenants or agreements herein contained on the part of said parties of the first part to be kept and performed, and such default or breach shall continue for the space of sixty days, then in such case, the said trustees or trustee hereunder for the time being, in their or his discretion, may, and upon the request in writing of the holders of one fifth in amount of the notes then issued and outstanding under these presents, said trustees or trustee for the time being shall, from time to time thereafter, either before or after entry as aforesaid, sell either together or in parcels the estates and property aforesaid, or any part or parts

thereof, at public or private sale, as said trustees or trustee shall think best, first giving, in case of any auction sale under this or under any other provision of this instrument, notice thereof by advertisement at least twice a week for four successive weeks in some public newspaper printed in said Providence, and such other notice as they or he may deem advisable; and upon sale thereof to execute and deliver such deed or deeds as may be necessary or proper to vest in the purchaser or purchasers thereof an absolute and indefeasible estate in fee simple therein.

" And it is hereby declared that said trustees or trustee for the time being shall stand seized of all the purchase moneys to arise and be received from sales or otherwise under any of the trusts of these presents, to apply and appropriate the same:

" First, to the payment of all expenses incident to such sale or sales, and of all insurance moneys, taxes, and other charges, if any, paid or incurred by them in respect of said trust estates, together with a reasonable compensation to said trustees or trustee for the time being for their or his own services, and reasonable counsel fees, and all other charges and liabilities paid or incurred by them, either in carrying on the business or in the execution of any other of the trusts hereby created.

" And secondly, the residue of all moneys received by them under any of the trusts of this instrument, from time to time, to apply and appropriate ratably to the payment of the principal and interest of all the debts and liabilities aforesaid of said parties of the first part which shall be brought in under these presents and remain outstanding as aforesaid, and of all the notes that shall be issued by said trustees and be outstanding under and secured by these presents, and although by their terms the same may not then have matured; accounting to said parties of the first part respectively, their heirs, executors, administrators or assigns, for any surplus that may remain after the full payment thereof.

" And it is further declared that no purchaser under any

or either of the foregoing trusts shall be under any obligation to inquire into the necessity or regularity of any sale thereunder, nor to see to the application of any of the purchase moneys thereof, but that the receipt of the trustees or trustee for the time being to such purchaser or purchasers for such moneys shall be his or their full and effectual acquittance and discharge therefor. And if at any time said trustee or any trustee to be appointed under these presents shall be desirous of resigning and of being discharged from the trusts aforesaid, it shall be lawful for them or him so to do, and in such case, or in case said trustee or any trustee to be appointed under these presents shall die, or become incapable of acting in said trusts, it shall be lawful for the surviving or continuing trustees or trustee for the time being, by any writing or writings under their or his hands, to nominate and appoint, or in case at any time all the trustees for the time being shall resign together, then for the Supreme Court of the state of Rhode Island, sitting in equity, to appoint any other person or persons to be a trustee or trustees in the stead and place of him or them so dying, resigning or becoming incapable of acting as aforesaid; and thereupon, and as often as any such appointment shall be made, all the trust estates and property then held under the trusts aforesaid shall, with all convenient speed, be so conveyed, assigned and transferred as to vest the same in the surviving or continuing trustees or trustee and such new trustees or trustee, or if there be no continuing trustee then in such new trustees or trustee only, their or his heirs, executors, administrators or assigns, to the same uses, and upon the same trusts as are herein declared concerning the same. And every new trustee under these presents so appointed, or otherwise duly appointed by any court of competent jurisdiction, may immediately exercise any power or discretion herein granted in the same manner as though originally named as trustee herein, and although the trust estate be not then vested in him. And no trustee under these presents shall be answerable or accountable for any

loss which may happen to said trust estate or property unless the same shall happen by his own neglect or default.

"And the said parties of the first part, for themselves and for their respective heirs, executors, administrators and assigns, do hereby covenant with the said party of the second part, his heirs, executors, administrators and assigns, at any time, or from time to time during the continuance of this security, to execute and deliver to the party of the second part, or other the trustees or trustee under these presents for the time being, or to any purchaser under any of the foregoing trusts, such further conveyances or assurances of the estates or property hereby conveyed or intended to be conveyed, or any part or parts thereof, as said trustees or trustee for the time being may reasonably require; and at all times during the continuance of this security, at their own costs and charges to keep and maintain insurance, for the benefit of said party of the second part under these presents, upon the mills, buildings, machinery and other insurable property hereby conveyed or intended to be conveyed, in such reasonable amounts and in such insurance companies as said trustees or trustee for the time being shall approve; also that the profits that shall hereafter accrue in the business of said manufacturing company shall, from time to time, be by said company paid over to said trustees or trustee for the time being, to be held and applied to any of the purposes aforesaid, in the same manner as the other trust moneys under these presents; also to pay all taxes and assessments, rates and charges of every nature that may be laid or levied upon or in respect of said granted premises; and in default thereof it shall be lawful for said trustees or trustee for the time being to effect such insurance, and to pay said taxes, assessments, rates and charges, and all sums paid therefor shall be a further lien upon said granted premises secured by these presents.

"In testimony whereof said A. & W. Sprague Manufacturing Company have caused these presents to be signed, and its corporate seal to be hereto affixed, by said Amasa Sprague, its treasurer, for this purpose fully authorized,

and said other parties of the first and second parts have hereunto set their hands and seals this first day of November, A. D. 1873."

" The A. & W. Sprague Manufacturing Company on or about the first day of November, 1873, executed the promissory notes described in the deed, and the same were indorsed by A. &. W. Sprague; and afterwards, on or about the 2d day of December, 1873, the notes, so indorsed, were delivered to Chafee, the trustee, and he, in pursuance of the provisions of the deed, afterwards countersigned and delivered to creditors of the A. &. W. Sprague Manufacturing Company and of William Sprague and Amasa Sprague, a large number of the notes, amounting in the aggregate to the sum of $8,700,000 and upwards—the amount delivered to the creditors respectively being the amount of their respective claims. Other creditors to a large amount refused to accept and did not accept the notes upon the terms prescribed by the deed. The deed was duly recorded in the land records of the town of Sprague on the 2d day of December, 1873.

The estimated value of the assets of the firm of A. & W. Sprague at the time of the delivery of the deed to Chafee, was $2,961,073, and the estimated liabilites of the firm at the same time, including their liabilities to the A. & W. Sprague Manufacturing Company, amounted to $2,633,000, and excluding their liabilities to that company they amounted to $1,524.000. The individual property of William Sprague, Amasa Sprague, Mary Sprague and Fanny Sprague on October 31st, 1873, was estimated to be of the value of $1,140,565, and they then were and still are liable for the debts of the A. &. W. Sprague Manufacturing Company.

After the delivery of the deed to Chafee, the National Bank of Commerce of Providence, one of the creditors of the A. & W. Sprague Manufacturing Company, commenced proceedings in bankruptcy against that company, but withdrew the same upon condition that the company and Amasa Sprague and William Sprague should execute assignments to Chafee of all their remaining interest in the property

conveyed by the deed.    The assignments required were thereupon prepared under the direction of the counsel for the bank, and being assented to by the counsel for the A. & W. Sprague Manufacturing Company, were executed and delivered to Chafee April 6th, 1874, and on the same day were duly recorded in the land records of the town of Sprague; and Chafee thereafter claimed that he held the property under and by virtue of the assignments as well as of the trust deed.

The assignments were in general terms, containing no particular descriptions, but purporting to convey all the interest of the grantors in the property described in the trust deed, and all of their estate of every kind wherever situated, not exempt from attachment by law.    The trust in the case of Amasa Sprague's assignment (the others being the same with only a change of name,) was declared to be to sell the property at public or private sale and convert the same into money and to apply the proceeds as follows:—" *First*, to the payment in full, if sufficient, otherwise ratably, of all the claims against the said Amasa Sprague provided for in said trust deed of mortgage of November 1st, 1873, which have been, or shall within nine months from the first day of November, 1873, be brought in and extended for the term of time provided in said trust mortgage, with authority in said trustee to make earlier payments than in three years' time of a part or the whole of the same, under the provisions of said deed of mortgage dated November 1st, 1873, or of this or any other preceding instrument.    *Secondly*, the residue of said proceeds to apply in full, if sufficient, otherwise ratably, to the payment of all my other claims.    And said trustee is hereby authorized and empowered, and it shall be his duty, to act faithfully for the interests of the creditors, and so as to obtain as prompt a settlement of their claims as practicable, and for that purpose he shall sell or dispose of any and all portions of the property conveyed to him by or under this or any preceding trust from time to time, as soon as reasonably may be, consulting the best interest of the

creditors in making such sales and disposition, to the end that he may pay and discharge in full, if the property be sufficient, otherwise *pro rata*, the obligations to my creditors within a reasonable time; and the said trustee is further authorized to run said mills and print works, or either or any of them, or to allow the grantor to run the same or any part thereof if for the best interests of the creditors, the profits of the same being receivable by the aforesaid grantee for the purposes aforesaid; and in case the same are thus run by him or otherwise, he shall not be liable personally for the expenses or losses arising therefrom, but the same shall be chargeable to the trust fund vested in him."

Notwithstanding the length of time that has elapsed since the delivery of the trust deed and assignments to Chafee, a very large portion of the property conveyed or attempted to be conveyed thereby still remains unsold; so that the amount of the fund which will be produced by the property of the A. & W. Sprague Manufacturing Company, and that of A. & W. Sprague, William Sprague, Amasa Sprague, Mary Sprague and Fanny Sprague, embraced in the trust deed or in the trust deed and assignments, cannot be ascertained by the court.

On the 28th day of October, 1873, the Franklin Institution for Savings had become, and then was, embarrassed and unable to pay its debts and obligations as the same respectively became due and payable, and to pay to its depositors the sums of money by them respectively deposited therein, with the declared dividends thereon; and on the 29th day of October, 1873, pursuant to law, the governor of the state of Rhode Island appointed Cyrus Harris, Jesse Metcalf and William B. Greene, commissioners, to visit and examine the institution, and to inquire whether the same had been and was then managed according to law, and to ascertain its state and condition; and said commissioners, pursuant to law, made report of their doings to the General Assembly of the state, on the 22d day of January, 1874.

In their report the commissioners, after stating the large amount of loans to the A. & W. Sprague Manufacturing

Company and the embarrassment of the institution by reason thereof, and that the institution had under their advice suspended payment, say:—" The loans were made to the corporation of the A. & W. Sprague Manufacturing Company, under the advice of able and shrewd legal counsel, and possibly do not conflict with the letter of the eighth section of the charter of the institution, which provides 'that no money shall be loaned to any member of the board of trustees.' The commissioners, however, believe that these loans, made to the trustees under the shadow of a corporate name, are gross violations of the whole policy and spirit of the law. * * * The books and accounts of the institution appear to have been correctly kept, and the loans on real estate and personal securities (other than those before mentioned) have been judiciously made. The commissioners have not applied to the Supreme Court to have a receiver appointed, hoping that the A. & W. Sprague Manufacturing Company would succeed in making such arrangements for the settlement of their indebtedness as would enable the institution, with a new board of trustees, to regain the confidence of its depositors. Excluding the entire amount of suspended paper, the institution can, without doubt, pay to its depositors seventy to seventy-five per cent. of their claims in a final settlement, and it is possible with a little patience and lenity on the part of the depositors, and a moderate extension of time to the delinquent debtors, the whole amount of the deposits may be secured."

On the 14th day of April, 1874, Cyrus Harris, Allen C. Mathewson, Christopher Robinson, James M. Kimball, J. O. Waterman, Henry L. Parsons, Gorham Thurber, F. W. Carpenter, Nelson W. Aldrich and E. Carpenter, claiming to be the board of trustees of the Franklin Institution for Savings, at a meeting then held, passed the following votes:

" *Voted*, that the standing committee be authorized to exchange the Spragues' liabilities for the new notes of the A. & W. Sprague Manufacturing Company, indorsed by A. & W. Sprague, on the terms proposed in the trust deed to

Z. Chafee; the bank retaining the original paper as collateral security.

" *Voted*, that should the standing committee fail in making the above named settlement, they are hereby authorized to make the exchange of the above named paper, as in their discretion they may deem best for the interest of the bank."

Cyrus Harris, Allen C. Mathewson, Christopher Robinson and James M. Kimball, claiming to be the standing committee, on the fifteenth day of April, 1874, passed the following vote :

" *Voted*, that the treasurer be authorized to receive the new mortgage notes of the A. & W. Sprague Manufacturing Company, indorsed by A. & W. Sprague, for the amount of the acceptances of Hoyt, Spragues & Co., held by this bank— $670,000—and also for the amount of the note of A. & W. Sprague Manufacturing Company, indorsed by A. & W. Sprague and Charles Greene, $57,000. The bank to retain the original paper, with the following indorsement on the acceptances of Hoyt, Spragues & Co.: 'A. & W. Sprague Manufacturing Company's mortgage notes accepted as collateral hereto. Time given to drawers and indorsers hereon, according to tenor of said mortgage notes.' All payments of interest or principal on the mortgage notes, or on the original paper, to be indorsed on both the new notes and the original paper. The bank to receipt to Z. Chafee, trustee, (see copy on file) for the new notes, and Z. Chafee, trustee, to sign an agreement to hold harmless this bank on account of the mode of computing interest, should said Chafee settle with any other party in a different manner, or should any court pronounce this method of settlement illegal. The treasurer is further authorized to receive the interest on the above named mortgage notes in advance, allowing rebate of interest on $11,866 from April 14th to July 1st, 1874, at $7\frac{3}{10}$ per cent. as per schedule on file, to which reference is made."

Theophilus Salisbury, treasurer of the Franklin Institution for Savings, in pursuance of the above vote, afterwards,

on the 15th day of April, received from Chafee promissory notes of the description mentioned in the trust deed, to the full amount of the liabilities of the A. & W. Sprague Manufacturing Company to the institution, and also received from Chafee, as trustee, a sum of money equal to the interest thereon to July 1st, 1874, with a rebate of interest, however, as provided in the vote, and executed and delivered to Chafee a receipt, as follows :

"Received of Z. Chafee, trustee, under the mortgage deed of the A. & W. Sprague Manufacturing Company and others, dated November 1st, 1873, the following notes of the A. & W. Sprague Manufacturing Company, issued under said mortgage, numbered [the numbers of the notes written here.] The above are issued and accepted as collateral security for the drawers' and indorsers' obligations upon the following described drafts of the A. & W. Sprague Manufacturing Company, upon Hoyt, Spragues & Co., and by the latter accepted, viz. : drafts numbered [the numbers of the acceptances of Hoyt, Spragues & Co. written here with the amount of each.] In consideration of the above, time is given to the drawers and indorsers of said draft, according to the tenor of said mortgage note. Providence, April 15th, 1874.

                    "FRANKLIN INSTITUTION FOR SAVINGS,
                          "By T. SALISBURY, Treasurer."

On the 5th day of August, 1874, one of the judges of the Supreme Court of the state of Rhode Island, upon the application of Jesse Metcalf and William B. Greene, two of the commissioners appointed by the governor of said state to visit and examine the Franklin Institution for Savings, granted an injunction restraining the institution from doing business; and the same court afterwards, on the 11th day of August, 1874, passed a decree that the institution be perpetually enjoined from exercising the powers and franchises conferred by its charter, and that the president, trustees, treasurer, and all the other officers thereof, be enjoined from proceeding further in transacting the business thereof; and by the decree Winthrop DeWolf was appointed receiver of

all the evidences of debt, goods, effects and property of every description belonging to the institution, and he thereupon gave bond as required by the decree and became receiver.

On the 13th day of July, 1875, DeWolf, as receiver, commenced an action against the A. & W. Sprague Manufacturing Company, and Amasa Sprague and William Sprague, before the Supreme Court of Rhode Island, on behalf of the institution, on the bills of exchange and notes held by the institution, and attached therein all, or substantially all, the Sprague property in the state of Rhode Island. But this action, after depending some time, was discontinued.

Chafee, as trustee, has made three semi-annual payments of interest on the trust mortgage notes, to wit: in January, 1875, July, 1875, and January, 1876, after the appointment of DeWolf as receiver, and one payment of ten per centum upon the principal of the notes; all out of the proceeds of the Sprague property; but neither DeWolf, as receiver, nor his successor, Thomas C. Greene, has ever accepted the same or either of them, but has declined to receive them.

DeWolf, after the commencement of the present action, died, and Thomas C. Greene has been duly appointed receiver of the institution in his place, and has accepted the trust and entered as plaintiff in the suit.

Continuously from the time of the appointment of DeWolf as receiver in August, 1874, till the present time, Chafee has had notice that the receivers repudiated the conveyances to him and the trust mortgage notes, and declined to be bound thereby. The following notice was sent by DeWolf to Chafee on the 15th of May, 1875:

"Providence, May 15, 1875.

" *To the A. & W. Sprague Manufacturing Company, Amasa Sprague, Treasurer; to A. & W. Sprague; and to Zechariah Chafee, Trustee.*

"I find among the assets of the Franklin Institution for Savings bills of exchange drawn by the A. & W. Sprague Manufacturing Co. upon Hoyt, Spragues & Company of

New York and accepted by them, payable to the order of A. & W. Sprague, and by them indorsed, to the amount of their face of $670,000, on the back of each of which are the following words stamped, but without signature : ' A. & W Sprague Manufacturing Company's mortgage notes accepted as collateral hereto, time given to drawer and indorsers hereon according to tenor of said mortgage notes.' I find also that the treasurer of said Franklin Institution for Savings on the 15th day of April, 1874, gave a receipt to Zechariah Chafee, trustee, for said so-called mortgage notes, equal in amount to the amount of said acceptances. I do not find upon the records of said Institution for Savings or among the papers in its files, any authority from the corporation for causing said acceptances to be so stamped or for the treasurer to give such a receipt. I find also the note of said A. & W. Sprague Manufacturing Company for $570,000, indorsed by Charles Greene and by the firm of A. & W. Sprague, and also an equal amount of said so-called mortgage notes, but without any evidence showing how the latter were to be held by said Institution for Savings. The whole transaction, including the stamping of the original bills of exchange, the receipt given for the so-called mortgage notes, and the holding of them by said Institution for Savings, being wholly unauthorized and without consideration, and which the officers of said corporation were then incompetent to make, and being for these and other reasons wholly void and of no effect, I hereby advise you that each and all of said so-called mortgage notes are subject to your order and will be delivered by me to any one authorized by you to receive the same, and I hereby demand that the so-called receipt signed ' Franklin Institution for Savings, T. Salisbury, treasurer,' be given to me forthwith.

WINTHROP DEWOLF, *Receiver*."

On the 10th day of November, 1877, DeWolf as receiver sued out of the Court of Common Pleas for the county of Providence his writ, wherein he impleaded the A. & W. Sprague Manufacturing Company, William Sprague and Amasa Sprague, as defendants in an action of the case to

recover the contents of the bills of exchange and promissory note referred to, which writ was served by attachment on certain real estates of the defendants, and which real estates are part of the same that were conveyed or pretended to be conveyed by the trust mortgage deed and assignments; and under the writ such proceedings were had that at the October term of the Supreme Court of Rhode Island in the year 1878, judgment was rendered in favor of DeWolf as receiver against the defendants for the sum of $826,912.78 damages, and $24.85 costs of suit, which amount of damages was the amount of the contents of all the bills of exchange and of the promissory note with interest and damages thereon, deducting therefrom the payment made by Chafee as aforesaid, and also certain sums of money which had been theretofore received by the Franklin Institution for Savings and by the receiver from certain persons who were liable, in respect of the bills of exchange and promissory note, with the defendants; and on the 15th day of March, 1879, a writ of execution on the judgment was issued, and the same has been levied on the real estate attached and on other real estate and personal estate of the defendants, which were conveyed or pretended to be conveyed by trust deed and assignments; and the execution now remains unsatisfied. And subsequently, at the term of the Superior Court held at Norwich within and for the county of New London in this state on the first Tuesday of June, 1880, the receiver in an action then pending in that court upon the judgment, recovered the judgment for which the lien in litigation in this suit was filed.

Chafee, early in December, 1873, immediately after the trust deed was delivered to him, took possession of all the property of the A. & W. Sprague Manufacturing Company, and has ever since held and managed the same, including the property in controversy in this suit. In consequence of suits and attachments against various parts of the property, and of claims made as to the title to the property in controversy in this suit by the heirs of Edwin Hoyt, de-

ceased, and by William S. Hoyt, and Charles G. Franklin and wife, Chafee has never been able to sell the property.

On the 26th day of March, 1876, a considerable portion of the Baltic Mill property in question was swept away by a flood, and Chafee was obliged to expend, and did expend, a sum exceeding $250,000 in the restoration of the property, and in repairs made upon the same.

The certificate of lien mentioned in the plaintiff's complaint was filed and recorded in the land records of the town of Sprague. The land described in the certificate was attached as the property of the A. & W. Sprague Manufacturing Company, on the 18th day of October, 1879, in the suit in which the judgment last mentioned was rendered; and at the time of the making of the attachment there was no other conveyance or incumbrance on record in the office of the town clerk of the town of Sprague of or upon the land than the trust deed and the assignments. And, for the purposes of this case, it was agreed by the parties that, on November 1st, 1873, the land was the property of the A. & W. Sprague Manufacturing Company.

Evan Randolph, the Stafford National Bank of Stafford Springs, Connecticut, claiming to be creditors of the firm of Hoyt, Spragues & Co., of which firm Amasa Sprague and William Sprague were members, Horatio N. Waterman, the Augusta Savings Bank, and the Union Bank of Boston, claiming to be creditors of the A. & W. Sprague Manufacturing Company, and all claiming to be non-assenting creditors to the deeds to Chafee, have brought various actions before the courts in various states upon their respective claims, and have attached divers large portions of the Sprague property (those claiming to be creditors of Hoyt, Spragues & Co. having attached the individual interest of Amasa Sprague and William Sprague in the property), and have sold such property upon execution, and have since, in some instances, filed other proceedings to recover possession of portions of the property so sold, which are now depending, and recovered their claims.

Neither Randolph, nor the Stafford National Bank, nor

Waterman appeared upon the books of the A. & W. Sprague Manufacturing Company, or of A. & W. Sprague, or upon any books of account which passed to Chafee under his trusts. Randolph never attached any of the trust estates, nor took any steps to notify Chafee of his claim, or of his intention to attack the trusts, until August 14th, 1883. The Stafford National Bank never attached any of the trust estates nor took any steps to notify Chafee of its claim, or of its intention to attack the trusts, until October 2d, 1878; Waterman never attacked any of the trust estates, nor took any steps to notify Chafee of his intention to attack the trusts, until April 21st, 1882. The validity of the attachments of Randolph and Waterman, and the question whether Waterman did or not assent to and ratify the trusts, is now in litigation in suits pending in the Supreme Court of the state of Rhode Island, and in the Circuit Court of the United States for the district of Rhode Island. The Augusta Savings Bank held collateral security for its claim against the A. & W. Sprague Manufacturing Company, and did not attach any of the trust estates until 1878, about five years after the constitution of the trusts.

The National Bank of Commerce of New York, a creditor to a large amount of the A. & W. Sprague Manufacturing Company and of A. & W. Sprague, that had never assented to any of the conveyances to Chafee or accepted any of the trust mortgage notes, on the 22d day of December, 1875, commenced an action upon its claims against the A. & W. Sprague Manufacturing Company and A. & W. Sprague, before the Circuit Court of the United States for the district of Rhode Island, and attached therein substantially all of the Sprague property in Rhode Island, and the same property that was afterwards attached by DeWolf as receiver on November 10th, 1877. On December 11th, 1878, the National Bank of Commerce obtained judgment and execution in the action, and thereupon sold under execution the whole of the Sprague property in Rhode Island that it had attached, and bid the same in itself and obtained deeds from the marshal of the district therefor.

Afterwards all the Sprague property in Rhode Island so obtained was sold, assigned and transferred to Robinson, Kimball & Jackson, as trustees, upon trust to sell the same, and to apply the proceeds—first, to the payment of the trust mortgage notes; second, to the payment of all the other Sprague liabilities.

At the request of creditors of the A. & W. Sprague Manufacturing Company, holding a majority in amount of the mortgage notes, Chafee has paid out of the trust assets the sum of $100,000 for the property to the Bank of Commerce. And the trustees have joined with Chafee in selling the most of the property in Rhode Island.

The A. & W. Sprague Manufacturing Company executed the trust mortgage deed with the intent and design to hinder and delay their creditors in the collection of their claims, by placing their property beyond the reach of ordinary civil process, and with the view of preserving the property in their control, possession and use, preventing shrinkage and loss, and continuing their manufacturing business by and through Chafee, as trustee, until they should be able to pay their creditors in full and have left a surplus for themselves. And Chafee well understood that such were the intention, design and views of the company at the time he accepted the trusts created by the deed.

The assignment was executed by the company with the same view, intent and design as the trust mortgage deed.

Sundry votes and other proceedings of the Franklin Institution for Savings, which are omitted here, are fully given in the dissenting opinion.

Upon these facts the case was reserved for the advice of this court.

*J. Halsey* and *R. Hicks*, for the plaintiff.

*C. E. Perkins*, for the defendants.*

---

* The points made on both sides are so fully presented and discussed in the majority and dissenting opinions that the arguments of the counsel are omitted.

CARPENTER, J. When this case was before us on a demurrer it appeared that the Franklin Institution for Savings was a non-assenting creditor. It now appears that on the 15th day of April, 1874, the treasurer of that institution, being authorized so to do by a vote of the board of trustees, and also by a vote of the standing committee, received from Chafee, the trustee, the new notes of the A. & W. Sprague Manufacturing Company for the full amount of their claims as collateral thereto, pursuant to the votes and upon the terms expressed in the trust deed. The institution then and thereby assented to the deed, unless such action was illegal for some of the reasons urged by the plaintiff's counsel.

The first is that the votes of the trustees and of the standing committee authorizing such assent were illegal, for the reason that the board of trustees and the standing committee were not legally constituted.

It is hardly necessary to examine the proceedings with a view to ascertain whether they are technically legal or not, because the proceedings clearly show that the trustees and the standing committee were in fact the only persons who could act, or who pretended to act, for the institution. They were clearly officers *de facto*, and their acts were binding upon the institution so far as other parties are concerned. Upon this point we entertain no doubt.

The objection to the application of this principle on the ground that the extension of credit was without consideration, is not well founded. It was not a mere naked extension. By it the institution was brought within the terms of the mortgage deed and was in a condition to participate in the security. That of itself is a sufficient consideration.

But a valuable consideration is not necessary. The acceptance of the trust deed by the savings bank presumably influenced the other creditors to accept it. So far as any considerable number of creditors refused to accept the deed and thus placed themselves in a position of hostility to it and became interested in setting it aside, it would constitute a serious objection to the acceptance of the deed

by the others, and each addition to the number who accepted it would become a consideration with the others for accepting it. When therefore one creditor had accepted the deed and thereby induced others to do it, he could not be permitted to revoke or nullify his acceptance on the ground that there was no consideration for his act. The savings bank in this case could not set up against the other creditors who accepted the deed, either the want of consid·eration, or irregularity of the appointment of its board of trustees.

But various reasons are urged why the assent should not operate to prevent the plaintiff from impeaching the deed to which the corporation was a party.

1. It is objected that the trustees had no power or authority to do what they assumed and undertook to do in the then condition of the bank; that the institution was a mere naked trustee for the depositors, having no beneficial interest in the property; that the depositors were the creditors of the corporation and *cestuis que·trust;* that the corporation was in fact insolvent; that the conveyance of the Sprague property to Chafee was a scheme to postpone creditors; and that under the circumstances an assent to it by the corporation was in violation of the trust.

On the assumption that the Sprague notes and acceptances could not be collected, the corporation was in fact insolvent. But they were then supposed to be collectible inside a period of three years; that the corporation would continue its business and be able to pay dividends; that at most the embarrassment was temporary; and that they would ultimately be able to pay all the depositors in full.

In that condition of things it was undoubtedly the duty of the trustees, in the exercise of a sound discretion, to do all that could be done to protect the interests of the depositors. Acting upon the light they had, they deemed it best to accept the provisions of the trust deed, and avail themselves of such payments as the trustee might be able to make. They may have misjudged, their action may have been unwise, but we cannot say that it was a gross breach

of trust, so much so as to raise a presumption of fraud. On the contrary, as the courts of that state have since determined that the deed was not fraudulent, a contrary course might have been open to severe criticism if not censure. They were charged with the duty of managing the affairs of this embarrassed institution, of caring for its assets and collecting its notes and securities. They are not to be judged wholly by subsequent events. If they acted in good faith, without negligence, and according to their best judgment, we cannot say that their acts were unauthorized. We are not satisfied that they did not believe, and did not have good reason to believe, that what they did was for the best interests of the depositors.

It is to be considered that, though the institution was embarrassed and had suspended payment, and its condition had been made the subject of an investigation and report by a committee appointed by the governor of the state, yet the trustees were the sole persons who represented the institution and had any power to act. A receiver had not yet been appointed. The whole responsibility as well as power rested with them. The condition of the bank had no effect upon their rights and duties beyond its presenting a reason for cautious and well-considered action. The question before the trustees was wholly a prudential one, and not at all one of power.

2. But it is said that the receiver, who represents the depositors, may repudiate the action of the trustees, and that their assent is not binding on him.

The receiver for most purposes represents and stands in the place of the corporation, and can enforce only such contracts and rights as it could enforce. But when acts have been done by the corporation in violation of law and in fraud of the creditors, the receiver, who for all beneficial interests connected with the trust is regarded as the representative of the creditors, may repudiate their acts, taking care, however, that third parties who are without fault do not suffer. Such cases, however, are exceptions to a general rule, and it should clearly appear that the case is within the

exception.  It does not so appear.  Acts of this character are to be judged mainly from a cotemporaneous standpoint and not altogether by results.  When men of character and intelligence and of acknowledged financial ability, aided by the advice of distinguished and learned counsel, deal with questions of this character, courts should be slow to condemn them.  Such men, acting under a sense of their responsibility, and with due regard to their own interests, are not likely to act in violation of law or in fraud of others.  We must require stronger reasons than exist in this case before deciding that they have so acted.

Upon the question whether the trustees were assenting to a fraudulent deed, there is this further to be said.  The Supreme Court of Rhode Island has since holden that the deed was not fraudulent, but valid.  If it was so when the court so decided, it was so when the trustees accepted it. There can therefore be no invalidity in their action on the ground that they were accepting a fraudulent deed.

But it is said that the deed is fraudulent under Connecticut law, and so of no validity to carry real estate here. If that be so, it does not affect the question we are considering, which is the validity of the action of the trustees in accepting the deed.  The transaction being in the state of Rhode Island, where all parties resided, from whose laws the trustees received their power, and to whose laws they were responsible, the sole question for them to consider was the validity of the deed there, and not its validity in every other state where there might be property of the mortgagors that the deed assumed to convey.

In Connecticut the question can be raised of the sufficiency of the deed to carry the title to land here; but whatever question is thus raised stands wholly outside of and unaffected by any question as to the validity of the action of the trustees in accepting the deed.  That question is governed by the laws of Rhode Island, and does not sway from one side to the other with the differing laws of the different states where portions of the property mortgaged may happen to be situated.

3. The plaintiff says :—" The receiver is at liberty to repudiate the assent because it was given by the trustees under a mistake of fact. The trust deed purported to convey the Sprague property in Connecticut, whereas in fact it did not do so for want of description." This objection fails, because, as we shall presently see, the deed was not void as to the Connecticut property, but was valid as to the assenting creditors.

4. The plaintiff also says :—" The trustees assented to give time according to the terms of the trust deed and notes; that is to say, they assented to what appeared on the face of the papers, and to that only. It appears from the finding of facts in the case that the deeds were merely a part of a fraudulent scheme between Chafee and the Spragues, designed not merely to carry out the provisions of the trust deed, but also to preserve the property in their possession, control and use, until they should be able to pay their creditors in full and have a surplus left for themselves."

The authorities cited in support of this proposition are cases where there was actual fraud, and the party claimed to be estopped was ignorant of the facts constituting the fraud. In this case the finding of fraud is in the following language :—" The said A. & W. Sprague Manufacturing Company executed the said trust mortgage deed with the intent and design to hinder and delay their creditors in the collection of their claims, by placing their property beyond the reach of ordinary civil process, and with the view of preserving said property in their control, possession and use, preventing shrinkage and loss, and continuing their manufacturing business by and through the said Chafee, as trustee, until they should be able to pay their creditors in full and have left a surplus for themselves. And the said Chafee well understood that such were the intention, design and views of the said company at the time he accepted the trusts created by said deed." And the same finding is applied to the assignment. Now it is obvious that the fraud consisted in postponing creditors, by placing the property beyond the reach of civil process, and for the purpose of

enabling the debtors ultimately to pay their debts in full, with interest, which they could not then do. There was no actual intent or desire to wrong any one. On the contrary, the transaction in fact contemplated an advantage to the creditors.

The real character of the transaction was apparent on the face of the papers. There were no extrinsic facts bearing upon the question of fraud except such as were apparent and known by all concerned. There was no attempt to deceive or mislead the trustees, and there is no pretense that they were in fact deceived or misled. In the cases referred to it seems to have been otherwise; there were facts of a fraudulent character of which the parties were ignorant. But the trustees knew that the acceptance of the deeds involved delay, but they, and all the other assenting creditors, doubtless believed that it would be better for them in the end.

The finding of fraud is evidently a legal conclusion, mainly from the fact that the deeds were calculated to hinder and delay creditors, and that only as to non-assenting creditors. Manifestly there is no fraud affecting the assenting creditors. As to them the transaction was open handed, no fact or circumstance of a fraudulent nature being concealed or withheld from them. Characterizing it as a "fraudulent scheme" does not change the nature of the real facts. The Supreme Court of Rhode Island, as we have before remarked, does not pronounce the transaction even legally fraudulent. How can it be said that a different view entertained by the courts of this state relieves the plaintiff of the consequences of the assent? We fail to see anything in this objection that destroys the force of the assent.

5. Again, the plaintiff says:—" Assent to an assignment is coupled with the implied condition that other creditors shall agree. The hands of one creditor cannot be tied by acquiescence, while all the rest are left at liberty to prosecute their legal rights."

This principle applies when the object is a composition

with all the creditors, or where there is a trust deed for the benefit only of certain specified creditors; but where, as in this case, the trust deed in terms is for the benefit only of such creditors as should accept its provisions, it contemplates the probability that some creditors will not accept, and the principle has no application.

A similar claim is made in another part of the brief, which we will notice in this connection. The counsel say: —" If by reason of the dissent of any creditor the trusts can be broken or the estate trenched upon, so that those who assent cannot get the benefit of the whole estate according to the deeds, then one who has assented is equitably entitled to be absolved of the assent he gave, and to treat his assent as null and void." If this is so it practically obliterates in all cases the distinction between assenting and non-assenting creditors. But it cannot be so in a case like this, where the conveyance is in terms for the exclusive benefit of those who assent. What will be the consequences if a non-assenting creditor succeeds in setting aside this conveyance is a question we will not anticipate.

6. The proposition that the plaintiff is absolved from all obligation growing out of the assent, by the non-payment of the notes within three years, is not sound. In ordinary cases it is doubtless true that if a creditor gives time, and the debt is not paid within the extension, suit may be brought. But where an extension is accompanied by an extension by nearly all the other creditors, and, as a part of the transaction, all the debtor's property is placed in the hands of a trustee for the benefit of such creditors, then, if the debts are not paid, while each creditor may perhaps sue and have a judgment against the debtor, yet he will not be permitted to attach the trust property and thereby have an advantage over the other creditors. He has cast in his lot with them, and must with them abide the result.

7. The plaintiff further says:—" If without consideration the creditor says the transfer may stand, and the grantor does not act upon the statement in a manner different from what he would otherwise have done, or, if the circumstances

are such that he can retract what he has said without prejudice to the grantors, he may still assail it."

The principle involved in this discussion is not the ordinary doctrine of estoppel; it has a broader significance. It is not merely the question whether a party is to be estopped from denying or proving a thing because he has by his conduct misled another, but it is whether a party who has derived a benefit from his act may afterwards repudiate it and thereby escape any unpleasant consequences. The corporation did receive quite a sum of money from the trust fund as the direct result of their assent to the deed. Now when that assent stands in the way of the receiver's collecting the whole demand from another portion of the trust property, he can hardly expect to be permitted to repudiate the assent on the ground that the debtor had not been misled or prejudiced. The question does not so much concern the grantors as it does the large number of creditors. Moreover there is a principle of public policy involved that a party will not be permitted to impeach, for fraud, a deed to which he has voluntarily and knowingly become a party.

Our conclusion, therefore, is that not only the corporation but the receiver is bound by the assent to the deed.

The plaintiff's counsel suggest, rather than seriously argue, that the bank assented to the deed but did not assent to the assignment; and that the plaintiff is now at liberty to impeach the latter and set it aside for fraud. If that is so, still the deed must stand and the plaintiff can only avail himself of the equity of redemption. We cannot see that that will be of any practical value to him.

But his position is hardly tenable. The mortgage deed was executed in November, 1873. On the 6th day of April, 1874, the mortgagors assigned or released to the mortgagee the equity of redemption, which carried with it, of course, the right which was expressly reserved in the mortgage deed to " the possession and use of said granted premises."

The two conveyances vested the whole title in the trustee. The mortgage deed, however, was the principal thing;

the equity of redemption was of nominal value only, and was, in some sense, a mere incident.

After these two conveyances were made the trustees of the bank voted, "that the standing committee be authorized to exchange the Spragues' liabilities for the new notes of the A. & W. Sprague Manufacturing Company, indorsed by A. & W. Sprague, on the terms proposed in the trust deed to Z. Chafee." The standing committee authorized the treasurer to receive the new mortgage notes, and he did so on the terms and conditions contained in the mortgage deed. But there is nothing in the transaction expressly limiting its effect to that deed. The assignment, so far as it had any effect at all, was beneficial to the trust estate.

In accepting an interest in the trust estate, in its then condition, we must presume that the bank intended to accept it as it was. There is no room for an assumption that it intended to accept the mortgage and repudiate the release of the equity of redemption. The trust estate was one entire thing; and the bank accepted it in its entirety. In doing so, it necessarily assented to the assignment as well as the mortgage.

We assent to the proposition that there can be no presumption in aid of a deed which the statute prohibits, or which the law for any cause must pronounce void. But a distinction is to be observed in this regard between deeds which are void and deeds which are voidable merely. No presumption will give effect to the former, while it may to the latter. This assignment at most was voidable only. No statute of Rhode Island prohibits it, and the law of that state does not declare it void; indeed, it is questionable whether in that state it can be regarded as voidable even. But assuming that it can, we see no reason why the ordinary presumption that an acceptance will be presumed when a deed is beneficial to the grantee, does not apply. It is hardly necessary, however, to resort to presumptions, for, as we interpret the votes of the trustees and the standing committee and the action of the treasurer, they amount to an intentional actual acceptance of the assignment.

We come now to consider the question whether these conveyances are inoperative as to the property in Connecticut for want of a proper description. In discussing this question we shall take no notice of the distinction between the mortgage and the assignment, but shall treat both conveyances as standing upon the same footing.

In another part of the brief and for another purpose, the plaintiff's counsel say that the savings bank accepted the trust deed in the belief that it conveyed to the trustee the Connecticut property. We have no doubt that this is true, and that every other creditor accepted it in the same belief. That the grantors intended to convey that property, and that the trustee supposed that it was conveyed, there can be no manner of doubt. In that respect this case is distinguishable from the case of *Herman* v. *Deming*, 44 Conn., 124. In that case the land in question was a wood lot which belonged to the wife of one of the parties who had signed the mortgage deed with her husband for the purpose of creating a lien on another piece of property which she owned and which was particularly described, and which, it may be presumed the contract between the parties called for. But there was no evidence that the wood lot was in the minds of the parties, or regarded as at all material or intended to be embraced in the mortgage, except the fact that after describing several pieces of land belonging to the different grantors, the mortgage deed contains these words :—"Also all such other lands as we the grantors, or either of us, own or have any interest in, situate in said town of Canaan; reference being at all times had to the land records of said Canaan and to the probate records for the district of Sharon for more particular description of the same."

The present case more nearly resembles the case of *Cake* v. *Peet*, 49 Conn., 501, where it was shown, *aliunde*, that the parties intended by such general words to embrace an " orebed," which was not described, but which was taken possession of and held by the grantee. In that case the deed was reformed so as to carry into effect the intention of the

parties.  In this case the intention of the immediate par-
ties to the deed to include in the conveyance the property
now in question satisfactorily appears, not only on the face
of the deed, but from all the circumstances attending the
transaction.  If necessary, therefore, in a case of this im-
portance, before rendering judgment for the plaintiff, and
thereby defeating the intention of the parties, we should
feel inclined to advise, as we have frequently done, that the
defendants, on amending their pleadings, would be entitled
to a judgment reforming the deed, and to a final judgment in
their favor.  But such a course is hardly necessary, because
the plaintiff is not in a position to raise that question.  His
relation to this property is that of one of many grantees.
He and the others, by accepting the deed, became in equity
parties to the contract therein expressed.  That contract
declares " that said trustees or trustee for the time being
may, at any time, or from time to time, before default or
breach as well as after, enter upon said granted estates and
property, or any part or parts thereof, and take and assume
the full and absolute possession and control of the same,
and in their or his discretion to continue to run and operate,
or to close the mills or print-works of said manufacturing
company, or any or either of them, as said trustees or trustee
for the time being shall deem for the best interests of the
creditors."

Pursuant to the authority so conferred the trustee took
possession of the property in question, and the same having
been extensively damaged by a flood, expended in perma-
nent repairs thereon of the trust money in his hands the
sum of $250,000.  We remark in passing, that if the plain-
tiff can now take this property from the trustee, on the
ground that it was never conveyed to him, the other credi-
tors must lose not only all right to participate in the prop-
erty itself or its avails, but must also, for aught we can see,
lose all their interest in the large amount of the trust
money thus expended.  And what they thus lose the plain-
tiff gains, inequitably as we think.

But to return.  The contract provides:—" And it shall

be lawful for said trustees or trustee for the time being, at any time, or from time to time, before such default or breach, or with or without previous entry, in their or his discretion, to sell at public or private sale any part or parts of said granted estates and property, etc." Again, the deed further provides, " that in case default shall be made in payment of said notes hereby secured or any or either of them, or of the semi-annual interest due thereon, or breach shall be made of either of the covenants or agreements herein contained on the part of the said parties of the first part to be kept and performed, and such default or breach shall continue for the space of sixty days, then, in such case, the said trustees or trustee hereunder for the time being, in their or his discretion may, and upon the request in writing of the holders of one fifth in amount of the notes then issued and outstanding under these presents, said trustees or trustee for the time being shall, from time to time thereafter, either before or after entry as aforesaid, sell, either together or in parcels, the estates and property aforesaid, or any part or parts thereof, etc." The deed then declares that the trustee shall stand seized of all the purchase moneys to arise and be received from sales or otherwise under any of the trusts, and that he is to apply and appropriate the same, first to the payment of expenses and charges, and secondly to the payment of the assenting creditors ratably.

All this, the party represented by the plaintiff, for a valuable consideration, agreed to in respect to every part and parcel of the property named in the trust deed. Notwithstanding said agreement, but in plain and palpable violation of it, the plaintiff now seeks to withdraw from the operation of said trust a portion of said property to the value of $1,000,000, more or less, and to appropriate the same exclusively to the payment of his own claim, correspondingly diminishing the trust property to the prejudice of all the other creditors. We think he ought not to be permitted to do it. He cannot ask a court of equity to permit him to break his contract in order that he may

gain an advantage over others whose equities are equal to his own.

But aside from any question of contract, express or implied, the plaintiff ought not to be allowed to allege that the trust deed is inoperative in respect to any portion of the trust estate. He and other creditors have accepted it as to all, and have thereby acquired certain rights and have received certain benefits. Good faith requires that each one shall stand by it as all understood it. No one now will be permitted to insist upon a different interpretation of the deed and thereby gain a further advantage at the expense of the others; for that would be inequitable and operate as a fraud.

A man will not ordinarily be permitted to impeach and set aside his own title. Obviously he cannot do that, if by so doing he at the same time takes and appropriates to his own use the title of others who stand upon the same legal and equitable plane with himself.

Neither the deed, therefore, nor the assignment was void for want of a more full description; but as to the plaintiff both were operative.

Thus far we have assumed that an assenting creditor cannot impeach these conveyances for fraud. The proposition is abundantly sustained by the authorities cited by the defendant's counsel, and it is admitted by the counsel for the plaintiff, the main contention being whether this case is within the rule. Having shown, as we think, that it is, we need only state the principle and refer to some of the authorities.

In ordinary cases the grantee has no occasion to assail the deed; he has only to refuse acceptance and it fails to become operative as to him. When he is associated with others in interest as grantee or as a beneficiary, the circumstances may be such that he may desire to avoid the deed *in toto ;* or his interest may be divided; in some respects it may be for his advantage to accept it, and in others to reject it. In all such cases, if he would avoid the deed, he must be careful not to accept it; for if he accepts he con-

sents that the deed shall operate according to its terms; and having consented knowingly the law will not permit him to retract to the prejudice of others. He cannot play fast and loose. Having made his election he must abide by it. This is especially so in all cases where acceptance carries with it certain advantages.

In bi-partite conveyances an acceptance is shown by the grantees' signature to it. In deeds poll his acceptance will ordinarily be presumed, if he has knowledge of the deed and expresses no dissent.

These conveyances were for the benefit only of those who should accept, and they were required to manifest their acceptance by doing certain things. The party represented by the plaintiff, with knowledge of the facts complied with the conditions imposed and thereby accepted the deeds, and by accepting was entitled to receive and did receive a portion of the trust funds. In doing so the corporation impliedly agreed that the other accepting creditors should have just what the deeds purported to convey to them, or for their benefit. If now in violation of that agreement the plaintiff is permitted to appropriate a portion of the trust estate to his own exclusive use, it operates as a fraud upon all the other assenting creditors. *Ex parte Alsop*, 1 De G., F. & Jones, 289; *Ex parte Stray*, L. R., 2 Ch. App., 374; Bump on Fraudulent Conveyances, 460; Burrill on Assignments, § 503; *Schuyler's Case*, 3 Benedict, 200; *Adlum* v. *Yard*, 1 Rawle, 163; *S. C.*, 18 Am. Decisions, 608; *Bodly* v. *Goodrich*, 7 Howard, 276; *Clay* v. *Smith*, 3 Peters, 411; *Rapalee* v. *Stewart*, 27 N. York, 310; *Chafee* v. *Fourth Nat. Bank*, 71 Maine, 514.

In a very recent case in the state of New York it was held that a party entitled to rescind a contract on the ground of fraud loses that right by bringing an action to enforce the contract after knowledge of the fraud. *Acer* v. *Hotchkiss*, 97 N. York, 395.

For these reasons a majority of the court advise judgment for the defendants.

In this opinion PARK, C. J., and LOOMIS, J., concurred.

HOVEY, J., dissenting. In disposing of this case as it stood upon the record at the time of the hearing upon the demurrer to the plaintiff's complaint, we held, after much deliberation, that the description in the mortgage deed of November 1st, 1873, was insufficient under the laws of this state to convey to the defendant Chafee any title to or interest in the premises which the plaintiff is seeking to foreclose. We also held that that deed, as a mortgage of real estate in this state, was fraudulent and void as against creditors of the A. & W. Sprague Manufacturing Company, who did not assent to it within the time limited by its provisions.

These conclusions, drawn from what appears on the face of the deed, are not affected by the facts found by the Superior Court from evidence taken at the hearing of the cause upon its merits. But it appears from the finding that the deed was executed by the A. & W. Sprague Manufacturing Company, not only for the purpose of preventing shrinkage and loss as therein stated, but also with the intent and design to hinder and delay their creditors in the collection of their claims, by placing their property beyond the reach of ordinary civil process and with the view of preserving it in their control, possession and use, and continuing their manufacturing business by and through Chafee as trustee, until they should be able to pay their creditors in full and have left a surplus for themselves. It also appears from the finding that the indebtedness and liabilities of the A. & W. Sprague Manufacturing Company and of Amasa and William Sprague, instead of amounting in the aggregate to about $14,000,000, as stated in the deed, amounted to less than $11,000,000; and that the indebtedness of the company alone amounted to only about $8,300,000 and that of Amasa and William Sprague, including liabilities to the company, to $2,633,000, and, excluding those liabilities, to $1,524,000. So that the indebtedness and liabilities of the company and of Amasa and William Sprague at the time the deed was executed, amounted, in the aggregate, to $3,000,000 and upwards less than the amount stated in the deed.

For the purposes of this case, therefore, I assume it to be settled that the deed conveyed to the defendant Chafee no title to or interest in the property in controversy in this suit for the want of a sufficient description thereof in the deed, and that if the description had been sufficient to pass the title, the deed as a mortgage of that property would have been fraudulent and void as against creditors who did not assent to it within the time limited by its provisions. It is also well settled that an assenting creditor who gives his assent to such a deed in ignorance of its fraudulent character, is not bound by the assent and may disaffirm the act on the discovery of the fraud.

In this state of the case the first question presented is, whether the Franklin Institution for Savings assented to the deed referred to.

By the terms of the deed, the actual assent of creditors, expressed by accepting in discharge of their claims, within nine months from November 1st, 1873, notes of the A. & W. Sprague Manufacturing Company, indorsed by A. & W. Sprague, having three years to run, and bearing interest at the rate of seven and three tenths per cent. per annum payable semiannually, or by agreeing to extend the time of payment of their claims for the period and according to the provisions of those notes, was necessary to entitle them to the benefit of the security which that deed provided.

From the records of the Institution for Savings, which form a part of the record in this cause, it appears that its board of trustees, at a meeting held on the 14th of April, 1874, passed the following votes :—

" *Voted*—that the standing committee be authorized to exchange the Sprague liabilities for the new notes of the A. & W. Sprague Manufacturing Company, indorsed by A. & W. Sprague, on the terms proposed by the trust deed to Z. Chafee ; the bank retaining the original paper as collateral security.

" *Voted*—that should the standing committee fail in making the above named settlement, they are hereby authorized

to make the exchange of the above named paper as in their discretion they may deem best for the interest of the bank."

Acting upon the authority thus conferred, the standing committee of the institution, on the 15th of April, 1874, passed a vote in the words and figures following:

" *Voted*—that the treasurer be authorized to receive the new notes of the A. & W. Sprague Manufacturing Company, indorsed by A. & W. Sprague, for the amount of the acceptances of Hoyt, Spragues & Co., held by this bank, $670,000; and also for the amount of the note of A. & W. Sgrague Manufacturing Company indorsed by A. & W. Sprague and Charles Greene, $57,000. The bank to retain the original paper with the following indorsement on the acceptances of Hoyt, Spragues & Company: ' A. & W. Sprague Manufacturing Company's mortgage notes accepted as collateral hereto; time given to drawers and indorsers hereon, according to the tenor of said mortgage notes.' All payments of interest or principal on the mortgage notes or on the original paper, to be indorsed on both the new notes and the original paper. The bank to receipt to Z. Chafee, trustee, (see copy on file,) for the new notes, and Z. Chafee, trustee, to sign an agreement to hold harmless this bank on account of the mode of computing interest should said Z. Chafee settle with any other party in a different manner, or should any court pronounce this method of settlement illegal. (See document on file.) The treasurer is further authorized to receive the interest on the above named mortgage notes in advance, allowing rebate of interest on $11,866 from April 14th to July 1st, 1874, at $7\frac{3}{10}$ per cent., as per schedule on file, to which reference is now made."

After the passage of this vote, but on the same day, the treasurer received from the defendant Chafee, as trustee, promissory notes of the description mentioned in the mortgage deed to the full amount of the A. & W. Sprague Manufacturing Company's liabilities and also a sum of money equal to the interest thereon to July 1st, 1874, with a rebate as provided by the vote of the standing committee, and

thereupon executed and delivered to Chafee, as such trustee, a receipt in the following terms:

"Received of Z. Chafee, trustee, under the mortgage deed of the A. & W. Sprague Manufacturing Company and others, dated November 1st, 1873, the following notes of the A. & W. Sprague Manufacturing Company, issued under said mortgage, numbered [the numbers of the notes written here.] The above are issued and accepted as collateral security for the drawers' and indorsers' obligations upon the following described drafts of the A. & W. Sprague Manufacturing Company upon Hoyt, Spragues & Co., and by the latter accepted, viz; drafts numbered—[numbers of the acceptances of Hoyt, Spragues & Co., written here with the amount of each.] In consideration of the above, time is given to the drawers and indorsers of said drafts according to the terms of said mortgage notes. Providence, April 15, 1884.

"*Franklin Institution for Savings,*
"By T. SALISBURY, *Treasurer.*"

Chafee then delivered to said Salisbury an instrument in writing, signed by himself as trustee, and dated Providence, April 14th, 1874, of which the following is a copy:

"Whereas, in the exchange of the 'Sprague paper,' so called, held by the Franklin Institution for Savings, under the trust mortgage executed and made to Zechariah Chafee to secure the liabilities and indebtedness of the A. & W. Sprague Manufacturing Company, of A. & W. Sprague as co-partners, and the individual indebtedness of William Sprague and Amasa Sprague, a difference of opinion exists between said trustee and said Institution for Savings as to the mode and manner of computing the interest on the same—the institution claiming that it is entitled to seven and three tenths interest on notes of A. & W. Sprague Manufacturing Company issued in settlement from the first January, 1874, rebating the same interest on paper not due on first January, 1874, from said first January, 1874, to the maturity of said paper; the said trustee claiming that six per cent only should be allowed up to the time

of the exchange of said paper, and seven and three tenths
interest from said day of exchange to first July, 1874; that
this mode of settlement should apply to all paper not
exchanged before the first day of April, 1874, that being
the time when said institution became a party to said trust
mortgage. The said institution now makes the exchange
under this protest, that if any legal decision of the courts
of this state should determine that the mode of calculating
interest suggested by the institution is a legal mode, or
the said trustee shall adopt that mode after the first of
April, 1874, of computing the interest in the exchange of
any other of the paper of the said mortgagors in said trust,
he, the said trustee, shall pay to said institution the differ-
ence in the amounts of interest between the two modes of
computation, whatever the same may be; to which protest
said trustee assents and hereby agrees to pay said difference
in interest accordingly."

The assent of the Institution for Savings to the mortgage
deed as it stood at the time the assent was given, is unques-
tionably established by the facts disclosed by these pro-
ceedings, if the institution could lawfully assent to the
terms of such a deed. It was an acceptance of the secur-
ity provided by that deed for the debts due to the institu-
tion from the A. & W. Sprague Manufacturing Company
and A. & W. Sprague, and upon the terms and conditions
set forth in the deed. But the deed as it then stood (and
it has ever since remained unchanged) did not embrace
the property in controversy or any other real estate in this
state. That property, therefore, was no part of the security
provided by the deed for the payment of the mortgagors'
debts, and no creditor assenting to the deed had a right to
rely upon it as such. The assent was limited to the terms
of the deed and did not extend beyond them, but was
exactly co-extensive with them. Bouvier in his Law Dic-
tionary, vol. 1, page 154, says: " Assent must be to the same
thing in the same sense; it must comprehend the whole
of the proposition, must be exactly equal to its extent and
provisions, and must not qualify them by any new matter."

And in that sense the assent of the Institution for Savings, *in the absence of evidence to the contrary*, must be presumed to have been expressed.

The next question is as to the effect of the assent upon the rights of the plaintiff, assuming, for the purposes of the inquiry, that the institution had the authority and power to express the assent. Does it preclude him from prosecuting and maintaining this action? The counsel for the defendants contends that it does, because he claims that the prosecution of the action is an attempt on the part of the plaintiff to repudiate the mortgage; which, he insists, the assent estops him to do. And he cites several authorities in support of this claim. Those authorities lay down the doctrine that a creditor who has assented to a deed of trust made for his benefit and for the benefit of other creditors, shall not afterwards, though the deed be fraudulent, be allowed to repudiate or impeach it. And that, no doubt, is the established doctrine where the assent is expressed with full knowledge of all the circumstances connected with the execution of the deed. The reason is that if a party assents to a deed with knowledge that it was executed with an intent and design to hinder, delay or defraud creditors, he makes himself, in one sense, a party to the fraud and must suffer the consequences of his act. But it is also well established, as already stated, that where the assent to such a deed is given in ignorance of its fraudulent character, the creditor is not bound by the assent, and may disaffirm the act on the discovery of the fraud. *Van Nest* v. *Yoe*, 1 Sandf. Ch., 4; *Johnson* v. *Rogers*, 14 Alb. Law Journal, 427. This, however, is not a case, as it now stands, and has hitherto stood upon the record, to which the doctrine stated has any application. The plaintiff is not *now* prosecuting this action for the purpose of repudiating or impeaching the mortgage deed or the assent of the Institution for Savings to the terms of it. He has no occasion or reason for doing so, so long as the deed remains as it now is, because the property he is seeking by his action to foreclose is not embraced in that deed and constitutes no part of the

mortgaged premises. He has the same right, therefore, to appropriate that property to the payment of the claims of the institution against the A. &. W. Sprague Manufacturing Company, as a mortgagee has to appropriate property not embraced in his mortgage, to satisfy the debt which the mortgage was given to secure.

It was suggested upon the argument by the defendants' counsel, and the suggestion was favorably received by a majority of the court, that as between the A. & W. Sprague Manufacturing Company and Chafee, the trustee, the property in controversy, in equity, was conveyed by the mortgage deed; that it was intended to be so conveyed to the latter, and if by mistake it was not, Chafee, by a bill in equity, might cause the deed to be so reformed as to include it. The jurisdiction of courts of equity to correct mistakes in deeds and other written agreements, so as to make them express the real intention of the parties, is well established. But the allegations in the pleadings lay no foundation for its exercise in the present case. The defendants were apprised by the decision of this court upon the demurrer that the description in the mortgage deed was not sufficient under our laws to convey to Chafee any title to, or interest in, the property in question, and that in respect to that property the deed, though not fraudulent, was void. The allegation in the complaint upon which the decision was rendered was, that the deed was fraudulent and void as to the plaintiff, because there was no description or boundaries given, and no reference was made in the deed to any book or document describing the boundaries of the land attempted to be conveyed by the deed, and the land was only described as " all the property, real, personal and mixed, not exempt from attachment by law, which the parties of the first part or any of them have and hold in the following towns of the state of Connecticut, viz.: Sterling, Sprague, Scotland and Windham." The answer of the defendants was a simple denial of the allegation. So that the only question upon this part of the case which the court could consider was, whether the description in

the deed was sufficient to convey to Chafee, the trustee, any title to or interest in the premises in controversy, and this question had already been determined adversely to the defendants after a full hearing upon the demurrer. The question whether the deed was intended by the parties to convey the premises to Chafee, but by their mistake or the mistake of the scrivener who drew it failed to do so, was not, therefore, raised by the pleadings, as it might have been under the Practice Act, and as it was in the case of *Cake* v. *Peet*, 49 Conn., 501, cited by the defendants' counsel; and consequently it was not before the Superior Court and is not now before us for our advice, and we have no right to consider it. It was also suggested by the counsel for the defendants that the expenditure of $250,000 from the trust fund in his hands in repairs upon the property in question and in restoring the portion that was swept away by the flood, should estop the plaintiff from the prosecution of this suit; and this suggestion also received the favorable consideration of a majority of the court. But it has no equity whatever to support it. The expenditures were made in 1876, nearly two years after the trustee had knowledge that the validity of the mortgage was questioned by Mr. DeWolf, the former receiver of the Institution for Savings, and while he (the trustee) was in possession under a deed of assignment from the A. & W. Sprague Manufacturing Company executed April 6th, 1874, and to which reference will hereafter be made. Besides, from the time the trustee took possession of the property until the present time, a period of nearly eleven years, the entire income, rents and profits of the premises, amounting presumptively to more than the sums expended, have gone into his hands, and now remain there unless they have been applied to the uses and purposes mentioned in the mortgage or to some other use. Upon neither of the grounds suggested, therefore, should it be held that the plaintiff is estopped or precluded from prosecuting and maintaining this action.

There are other reasons why the plaintiff should not be thus estopped and precluded, and why, as to him and the

depositors of the institution represented by him, the mortgage deed cannot justly or equitably be treated as a mortgage of the property in controversy, as the majority of the court propose, or reformed so as to embrace that property. In the first place, the Institution for Savings had no power, authority or right, through the action of its board of trustees or otherwise, to assent to the mortgage and bind its depositors thereby without their consent. The institution was incorporated by the General Assembly of Rhode Island in 1855 as a savings bank, and was organized and commenced business in the city of Providence soon after its incorporation. It received, loaned, invested and paid back deposits, made dividends from the earnings at stated periods, and carried on its operations as a savings institution from that time until the latter part of October, 1873, or the early part of November of the same year, when it ceased to receive and pay out deposits; and on the 11th of August, 1874, it was restrained by an injunction from the Supreme Court of that state, from the further exercise of its franchises, and a receiver was appointed. From the act of incorporation it clearly appears that the institution was, like the savings institutions of this state, a trustee and an agent, created for the purpose of receiving, taking care of, loaning and investing money on account of its depositors, and of paying back the same with accrued interest and dividends to its owners at such times and upon such notice as were stipulated by the parties at the time of the making of the deposits or as the charter or by-laws of the institution prescribed. *Savings Bank* v. *New London*, 20 Conn., 111; *Coite* v. *Society for Savings*, 32 id., 173; *Bunnell* v. *Collinsville Savings Society*, 38 id., 203. It had no stock and no capital. Its assets, which amounted on the 30th of October, 1873, to $2,819,723.52, including claims to the amount of $727,000 against the A. & W. Sprague Manufacturing Company and A. & W. Sprague, consisted of loans and investments made by its officers for the benefit of its depositors, who then numbered 6558; and from them the money loaned and invested was derived. In case of losses happening, other-

wise than by loans made to members of the board of trus-
tees, or from the wilful, corrupt misconduct of the members
of that board, the institution had no property out of which
the losses could be made good or paid, or to which deposi-
tors could look for payment or security.   The charter
provided that no money should be withdrawn from the insti-
tution by a depositor except one week's notice of the inten-
tion to withdraw the same should be given to the treasurer
in writing.   There was no other provision in the charter
requiring a longer notice to be given, but a by-law passed
October 27th, 1873, required a notice of sixty days.   The
depositors had, therefore, the right to treat this provision of
the charter or the by-law referred to, as an irrevocable stipu-
lation on the part of the institution that it would pay to
them the amount of their deposits after the notice specified
had been given and the time fixed had expired.   Under
these circumstances the institution was bound as a trustee
and an agent, as well as a debtor, of its depositors, to make
or arrange its investments and loans in such a manner as to
enable it, extraordinaries excepted, to pay to its depositors
the sums due to them at the times stipulated or prescribed
by its charter or by-laws, or at the time agreed upon when
the deposits were made.   Many extraordinary contingencies
might, of course, arise to prevent the collection of money
necessary to a literal performance of its obligations in this
respect, even if the loans and investments were made in
strict accordance with the true spirit of the charter of the
institution and the objects and purposes of its organization.
But of that depositors would have no cause to complain,
because, in such cases, it would have been by no unlawful,
wrongful, negligent or improvident act on the part of the
institution or its officers that such contingencies happened.
But the institution had no power, authority, or right, to
place itself voluntarily, and without the consent of its
creditors or beneficiaries, in a position which would inevi-
tably prevent the performance of this important part of its
trusts, by extending the time of payment of its claims
against the A. & W. Sprague Manufacturing Company and

A. & W. Sprague, amounting to $727,000, for the period of three years.

The record shows that as early as the 28th of October, 1873, the affairs of the institution had become so much embarrassed that it was unable to pay its depositors the sums of money called for by them, according to the charter and by-laws, and that on the following day the governor of the state of Rhode Island, pursuant to law, appointed commissioners to visit and examine it and to inquire whether it had been and then was managed according to law, and to ascertain and state the condition of the same,—it having a few days previously refused payment to its depositors of sums exceeding twenty-five dollars on each account. The record also shows that the commissioners so appointed performed the duty devolved upon them, and found the institution in such a condition, owing to the large amount of suspended paper it held against the A. & W. Sprague Manufacturing Company and A. & W. Sprague, that they recommended a suspension of further payments by the institution, and submitted a report of their doings and the result of their inquiries to the General Assembly at its session in January, 1874. The record further shows that the standing committee of the institution, at a meeting held November 3d, 1873, passed a vote directing the treasurer to conform to the recommendation of the commissioners and to allow no withdrawal of deposits until he should be allowed to do so by that committee. And on November 13th, 1873, the board of trustees adopted and ordered to be published the following statement:—

"Franklin Institution for Savings, Providence, R. I. This institution was examined on the thirtieth of October last by the commissioners appointed by the governor, and their statement of its condition has been published. In view of its situation the commissioners and the standing committee deemed it best for the bank to cease receiving and paying out deposits. The dividend usually declared November 1st, was omitted. The suspension of Hoyt, Spragues & Company and the A. & W. Sprague Manufac

turing Company, and the extraordinary condition of the money market, render it impossible for the institution to provide for the large amount of withdrawals notified for the 16th of November. The payment of the withdrawals notified under the sixty day rule must depend upon the condition of the money market, the ability to turn its securities into money and the early settlement of the indebtedness of the above named houses. If such settlement can be reached (of which there is a good prospect) the trustees believe that the depositors will ultimately suffer no loss. The attention of the depositors is called to the annexed condensed statement of the condition of the bank as published by the commissioners.

"By order of the board of trustees.

"T. SALISBURY, *Treasurer.*"

The statement published by the commissioners showed the liabilities of the institution, at the time they examined it, to be $2,819,723.52, and its resources, including its claims against Hoyt, Spragues & Co., A. & W. Sprague Manufacturing Co. and A. & W. Sprague, the same amount.

On November 1st, 1873, the standing committee directed a notice to be sent to parties whose notes secured by mortgage would fall due the next month, and to certain other parties, that the situation of the institution made the speedy conversion of a large portion of its assets into money necessary in order to meet the demands of depositors. On December 1st, 1873, the board of trustees, by a vote then passed, authorized the standing committee to notify all persons indebted to the institution, where the debt was secured by mortgage and due during that month and thereafter, that the same would be payable at maturity, and that no such mortgage securities would be extended by the payment of the usual semi-annual interest in advance, and that rebate of interest would be allowed when debts were paid before maturity. On December 13th, 1873, the members of the institution, at a meeting then held, appointed a committee to examine its affairs, to nominate a new board of trustees, or to recommend the adoption of

such measures as should be for the benefit of the institution. The committee so appointed submitted to the institution on the 30th of December, 1873, a report containing a statement of its condition, the names of persons proposed by them for a new board of trustees, and a recommendation that in view of the conditions stated the institution should continue its existence, and that the depositors agree to a temporary suspension of withdrawal of deposits (except dividends of profits) until such time as the indebtedness of the Messrs. Sprague should be made available. That report was referred to the new board of trustees, appointed January 3d, 1874.

On February 25th, 1874, the standing committee adopted a form of an agreement to which the signatures of the depositors were to be invited. It was as follows:—

" We, the undersigned, depositors in the Franklin Institution for Savings, having confidence in the present board of trustees, and deeming it desirable and for the interests of the depositors that the institution should continue its business, hereby severally agree that upon the resumption of business we will not withdraw our respective deposits or any part thereof, except dividends of profits, but permit the same to remain in the institution for such reasonable time in the discretion of the trustees as shall seem to them necessary."

This paper was submitted to the board of trustees March 2d, 1874, and that board, by vote, added thereto the following:—" The above agreement is not binding unless one half of the depositors sign the same, representing three fourths of the amount of the deposits."

Depositors were requested to sign the paper so adopted by the standing committee and amended by the board of trustees from March 2d, 1874, until April 28th, 1874, when the standing committee, at a meeting then held, declared it to be inexpedient longer to ask depositors to sign it.

What number or proportion of the 6558 depositors were invited to sign, and what number or proportion did sign their paper, the record does not show. But presumably the

number and proportion required by the vote of the board of trustees could not be induced to sign it. For the joint special committee of the General Assembly of Rhode Island on savings banks, in a report submitted to that body in March, 1874, and before the 24th of that month, state that of the 6558 depositors some 1400 had received the dividend then recently paid out (referring to a dividend of three per cent. declared February 24th, and payable on and after March 4th, 1874;) that of that 1400 about two thirds had signified their willingness for the continuance of the bank; that the other third had declined to express themselves in favor thereof; that to this one third there was due a larger aggregate sum than to the two thirds who had agreed to a continuance; and that over 4000 were silent. In the same report that committee considered the question whether the Franklin Institution for Savings ought to wind up its business or be compelled to wind up its affairs, and in reference to it said:—" This question, the commissioners appointed by the governor to examine said institution, and ' inquire whether it has been and is now managed according to law, and ascertain its state and condition,' did not answer. They say that a very large fraction of its loans were made ' in gross violation of the whole policy and spirit of the law,' but they did not apply to the Supreme Court for the appointment of a receiver because they hoped that arrangements would be made for the payment of the large amount of suspended paper, and that a new board of trustees might regain the confidence of the depositors. That is to say—the commissioners suspended judgment awaiting the arrangement of the indebtedness of one concern (substantially) of $727,000; the liabilities of the institution being $2,819,723.52. The commissioners closed the doors of the institution October 30th, 1873. Five months have elapsed. A new board of trustees has been elected, commanding the confidence of the depositors and the community. But what arrangements have been made for the settlement of this indebtedness of $727,000? None whatever. The arrangement

proffered by the debtors has not been acceded to by the institution. If accepted it would postpone payment for three years. Whether eventually accepted or not, how much of this indebtedness will finally be paid it is impossible to say. In the meantime the bank can do no business. It does not hope to receive a dollar of deposit: it cannot safely pay out a dollar of the principal it owes its depositors. How long, in justice to the depositors, and in view of public policy, ought this state of things to be allowed to continue? It is not to be forgotten that this unexpected locking up of resources is distress to many, ruin to some. There are 6,558 depositors; of them some 1,400 have received the dividend paid out recently. Of this number about two thirds have signified their willingness for the continuance of the bank. One third have declined to express themselves in favor thereof, and to this one third is due a larger aggregate sum than the two thirds who have agreed to a continuance. Over four thousand are silent. When the fundamental element of usefulness of a savings bank is confidence in it, how can it be said that, under such a condition of affairs, even the wisest and most honest men are likely to give this institution health and strength? If it could be done, it can only be accomplished after the lapse of years; and in the meantime the resources of the poor, the capital of the trader, the lifelong earnings of the widow and the inheritance of orphans, are kept locked up, and they deprived of what is their own, and to which, so much of it at least as can be got, they are entitled. Justice to individuals and public policy alike demand that the available assets of this institution be as speedily as possible given to those to whom it belongs."

This report was laid before the standing committee of the institution on the 24th of March, 1874. That committee apparently paid little heed to it; but at the close of their proceedings the treasurer, by general consent, was directed to proceed with the ordinary business of the institution as usual. There was no change in the condition of the institution between that time and the 28th of April, 1874. It

was then struggling to obtain the consent of its depositors to continue its existence, and in the midst of the struggle, when apparently there was no reasonable ground to hope for success, its board of trustees, in opposition to the will of its depositors as they had fully ascertained, authorized its assent to be given to the mortgage deed; and the assent was accordingly given as has been shown. A majority of the court are of opinion that the institution had the power, even under these circumstances, to express such assent, and that the depositors, and the plaintiff who represents them, are concluded and bound by the expression. In this opinion I am unable to concur. The depositors were entitled to demand payment of their deposits with the accrued interest upon them after proper notice given of their desire to withdraw them, according to the charter and by-laws, which notice in no case exceeded sixty days. As early as the 14th of November, 1873, the institution had been compelled to notify its depositors that it was impossible to provide for the large amount of withdrawals notified for the 16th of that month. It had ceased to receive and pay out deposits fifteen days before. Confidence in its management was so far gone that after strenuous exertions it failed to procure the consent of one fifth of its depositors for the continuance of its corporate existence. Under these circumstances it was plainly the duty of those in charge of the management of its affairs to collect its claims against its debtors, including those against the A. & W. Sprague Manufacturing Company and A. & W. Sprague, so far as they could with reasonable diligence, and for that purpose to use all the means which the laws of the states and of the union had provided. It could not, consistently with that duty, or with the virtually expressed will of its depositors, or its obligation to manage the affairs of the institution and the trust property under its charge for the benefit of the depositors, and with the diligence of a provident owner, assent to the terms of the mortgage, and thereby deprive its beneficiaries, for the period of three years, of the use of $727,000 of their own

property for the benefit of those from whom the same was due.

But there is a graver reason than either of those assigned why the plaintiff should not be estopped and precluded from prosecuting and maintaining this action, and why the mortgage deed should not be changed so as to embrace the property in controversy in this suit, or be treated, as against the plaintiff, as a mortgage embracing that property. And that is, the deed is fraudulent and void as against the creditors of the A. & W. Sprague Manufacturing Company in respect to their real estate situated in this state, and may, if it be changed or treated as suggested, be impeached by non-assenting creditors, and by creditors assenting in ignorance of the fraud, and upon their application may be set aside. In the first place, the grossly exaggerated statement in the deed of the indebtedness and liabilities of the company, and of A. & W. Sprague, constituted a badge of fraud, as it must have been intentionally made; and, unexplained, it justifies a finding of fraud in fact in the concoction and execution of the instrument. Wait on Fraudulent Conv., § 228, and cases there cited. "No device can be more deceptive and more likely to baffle, delay or defeat creditors than the creating incumbrances upon their property by embarrassed men for debts that are fictitious or mainly so. The false pretence of a debt, or the designed exaggeration of one, is an act of direct fraud." Per RUFFIN, C. J., in *Hawkins* v. *Alston*, 4 Ired. Eq., 145. In the next place, the deed was fraudulent, as we held on demurrer, because it pledged the property of the A. & W. Sprague Manufacturing Company, a corporation in insolvent circumstances, not only for its own debts and liabilities, but also for the debts and liabilities of Amasa Sprague and William Sprague. *DeWolf* v. *A. & W. Sprague Manufacturing Co. et al.*, 49 Conn., 282. Those parties, as partners and as individuals, joined the company as grantors or mortgagors in the deeds, and pledged their property for the company's debts and liabilities as well as for their own. But they were stockholders of the company, and by the laws of

Rhode Island were personally liable for the company's debts. In joining in the deed, therefore, they merely pledged their partnership and individual property to secure, as far as it would secure, the payment of their own debts. Mary Sprague and Fanny Sprague, the other parties who joined in the deed, were also stockholders of the company, and therefore liable personally for its debts. They owed no other debts. But the company was not indebted to the firm of A. & W. Sprague, nor to the members of that firm as individuals; nor was it liable for the debts of the firm or of its members until it fraudulently assumed them on the first of November, 1873. It was, however, indebted to the Franklin Institution for Savings for money borrowed $727,000, and to other parties about $7,573,000, amounting in the whole to about $8,300,000; and it was legally and morally bound to pay or secure those creditors before it appropriated any portion of its property to the payment of the debts of its stockholders or of other parties. But instead of doing so, it assumed the debts of Amasa and William Sprague, amounting, as already shown, to not more than $2,633,000, or made itself primarily liable for them, and then executed notes to the amount of $14,000,000, or more than $3,000,000 in excess of its own debts and the debts assumed, and executed the mortgage under consideration to secure their payment. The estimated value of the property of the company at that time was about $14,000,000; that of the firm of A. & W. Sprague, $2,961,075; and the individual property of Amasa Sprague, William Sprague, Mary Sprague and Fanny Sprague, $1,140,565; but all shares of stock of the parties in corporations wherever located, but the value of which does not appear upon the record, were excepted and excluded from the conveyance.

In view of these facts and the magnitude of the fraud shown by them to have been perpetrated in the execution of the mortgage in question upon the creditors of the A. & W. Sprague Manufacturing Company, I am unable to see upon what principle of law or equity the plaintiff can

be held bound by the assent of the institution to the terms of the deed. If the officers of the institution who expressed the assent knew at the time of expressing it the fraudulent character of the deed, they made themselves parties to the fraud, and neither the depositors nor the plaintiff as their representative ought to be bound by the assent. If they acted in ignorance of the fraud (as the law presumes that they did,) the former receiver, Mr. DeWolf, had the right to repudiate the act, as he did, as soon as it came to his knowledge. *Johnson* v. *Rogers, supra; Van Nest* v. *Yoe, supra.* So that whether the officers of the institution knew that the deed was fraudulent or not at the time of assenting to its provisions, neither the former receiver nor the plaintiff was bound by the assent. I am also unable to see upon what principle or rule this court, after holding as it did upon the demurrer that the deed for the want of a sufficient description of the premises failed to convey to Chafee any title to or interest in the property in controversy, can, in the present state of the pleadings and without giving the plaintiff an opportunity to be heard, assume that the failure occurred through the mistake of the parties or the scrivener who drew the deed, and, without evidence except what appeared upon the record at the hearing upon the demurrer, and without any application on the part of Chafee or any body else, treat the deed as it stands as a sufficient conveyance of the property. Nor can I see how, if the question was raised by the pleadings and reserved for our advice, we could, after having pronounced the deed as a mortgage of real estate in this state to be fraudulent and void as against non-assenting creditors, advise the Superior Court to reform it, so that the property in controversy should be a part of the mortgaged premises, and thus aid the parties to the deed in consummating the fraud.

The decision of the Supreme Court of Rhode Island—the court of last resort in that state—affirming the validity of the mortgage deed, is entitled to the respect in this and other states which is due to such decisions on principles of interstate or international comity. On those principles

conveyances of personal property valid by the law of the owner's domicile or of the place where they are made, are recognized as valid in every state or country where the property may be situated, unless the laws or established policy of such state or country forbid it. But these principles do not extend to conveyances of real estate. The validity of such conveyances must always be determined by the laws of the state or country where the land is situated. And this rule applies to mortgages as well as to absolute conveyances. Thus, if the laws of the state or country where the lands lie recognize the validity of a mortgage by a deposit of the title deeds by a debtor with his creditor, the laws of that state or country must govern as to the lien, although the transaction be had in another state. But if such mortgage be not recognized in the state where the lands lie, the fact that a deposit is made in a state or country where a mortgage in this form is recognized, will not enable the creditor to enforce it against the lands. And so if the laws of the state prohibit the making of a mortgage to secure future advances or liabilities, a mortgage in this form of land in that state would not be recognized there, although made in a state where such a mortgage would be valid; and on the other hand, such a mortgage made in the former state where it would not be valid but covering land in a state where such a mortgage is valid, would be enforced in the latter state because it is a valid conveyance there. Under this rule, the question whether the mortgage deed under consideration, if the land in controversy were sufficiently described to make it a part of the mortgaged premises, was fraudulent or not as a mortgage of that land, must be determined by the laws of this state; and for that reason the decision referred to cannot be permitted to control or influence or affect our judgment.

There are other reasons which seem to me to be sufficient why the mortgage deed should not be treated as a mortgage of the property in controversy, or changed so as to make it so, and why judgments should be advised in favor of the plaintiff.

The mortgage deed being insufficient to pass to Chafee, the trustee, any title to or interest in the property, the only title he has or ever has had to that property is that which he derived under and by virtue of the deed of assignment of April 6th, 1874, from the A. & W. Sprague Manufacturing Company. That was a general assignment of all the property of the company, real, personal and mixed, of every name and nature, wherever situate, not exempt from attachment by law, to Chafee, upon trust for the benefit of all their creditors, but with preferences in favor of those who within nine months from November 1st, 1873, brought in and extended their claims provided for in the mortgage deed for the term of time therein prescribed. The general description of the premises in that deed was, undoubtedly, sufficient under an usage that had prevailed from a very early period, to pass to the trustee the title to the property in controversy as between the parties and as to all others except non-assenting creditors. As to that class of creditors it was fraudulent and void, and so adjudged by this court for reasons stated in the case of *De Wolf* v. *The A. & W. Sprague Manufacturing Company*, 49 Conn., 282. The Franklin Institution for Savings is one of the creditors of that class, unless its assent to the deed of assignment is to be presumed from the proceedings of its officers already detailed, by which its assent was expressed to the mortgage deed, or because the deed of assignment was beneficial to the creditors for whose benefit it was professedly executed. But no such presumption arises from the proceedings referred to, as those proceedings plainly show. The only deed referred to in the votes of the board of trustees by which the contract of assent was authorized and in the receipt of the treasurer by which it was expressed, and also in the instrument delivered to the treasurer by Chafee upon the completion of the contract, was the mortgage deed. And there was no evidence that the officers of the institution, at that time or at any time afterwards while entrusted with the management of its affairs, had any actual knowledge or any notice of the existence of the

deed of assignment, except such notice as the law implies from the recording of the deed in the land records of the town of Sprague on the 7th of April, 1874, and in the land records of the city of Providence on the following day. But it was contended upon the argument by the counsel for the defendants that the deed was clearly beneficial to those creditors who assented to the terms of the mortgage deed, as it, with other similar deeds of assignment executed by the firm of A. & W. Sprague and by Amasa Sprague and William Sprague individually, prevented the continuance of proceedings in bankruptcy which had been commenced before the deeds were executed, and conveyed to Chafee, the trustee, the title to the property valued at about $1,000,000, if it was not conveyed by the mortgage deed, and also conveyed much other property which was not embraced in the mortgage deed; and that under those circumstances and upon those grounds the law presumed the assent of the Institution for Savings to the deed of assignment unless its dissent was shown. It is, undoubtedly, a correct general proposition and a well established rule of law, that if a deed of assignment made to a trustee for the benefit of creditors is actually beneficial to them, their assent to the deed will be presumed unless the contrary is shown. But the rule applies only to deeds which are executed in good faith and with an intent to benefit the creditors, not to hinder, delay or defraud them. It has no application to deeds of assignment like the one under consideration, which was executed with an intent and design to hinder and delay creditors, and which exempted the trustee from liability for losses happening to the trust estate by his neglect, default or misconduct, or to assignments which restrict the liability of the trustee to a less degree than that which is imposed upon trustees by law, or to fraudulent assignments or fraudulent conveyances in any form. 2 Story Eq. Jur., § 1036 $a$; Burr. on Assignments, 3d ed., § 261, p. 350; id., § 287, p. 389; 2 Perry on Trusts, § 593; Bump on Fraud. Conv., 329; *Halsey* v. *Whitney*, 4 Mason, 206; *Stewart* v. *Spencer*, 1 Curtis C. C., 167;

*Townsend* v. *Harwell*, 18 Ala., 301; *Ashley* v. *Robinson*, 29 id., 112; *Benning* v. *Nelson*, 23 id., 801; *Baldwin* v. *Peet*, 22 Tex., 708; *Fellows* v. *Vicksburgh R. R. & Banking Co.*, 6 Rob. La., 246; *Duval* v. *Raisin*, 7 Mo., 449; *Brown* v. *Warren*, 43 N. Hamp., 430; *Spinney* v. *Portsmouth Co.*, 25 id., 9. The law never presumes the assent of creditors to such assignments or conveyances and does not regard them as beneficial to creditors unless they are actually assented to by all for whose benefit they are professedly executed, so that all may be bound by their provisions and estopped to dispute their validity. Id.; *Mauldin* v. *Armistead*, 14 Ala., 709. For if the assent of any of the creditors is refused, they may severally treat the instruments by which the assignments or conveyances are made as void, and, by appropriate legal proceedings, impeach them and cause them to be set aside, or may attach the trust estate, and by means of such attachment acquire a lien thereon to the amount of their respective claims, and, upon obtaining judgment and execution, may have sold or set off so much as may be necessary to satisfy their several judgments, or, if the estate be real estate, may severally file a certificate of their respective judgments in the town clerk's office of the town in which it is situated and continue their respective liens thereon, and, at any time thereafter, may foreclose the liens in the same manner as mortgages upon the same estate. The record shows that creditors to a large amount have never assented to the mortgage deed or to the deed of assignment, but have hitherto refused so to do. One of them, the National Bank of Commerce of New York, on December 22d, 1875, attached substantially all the property in Rhode Island embraced in those deeds, in a suit brought to the Circuit Court of the United States for the District of Rhode Island, against the A. & W. Sprague Manufacturing Company and A. &. W. Sprague, obtained judgment December 11th, 1878, took out execution, and caused the property to be sold by virtue thereof; and the defendant Chafee, at the request of creditors holding a majority in amount of the mortgage notes, paid to

the attaching creditor from the trust funds in his hands $100,000 for the property; and the same was then transferred to three trustees, of whom Chafee was not one, upon trust to sell the same and apply the proceeds, first, to the payment of the mortgage notes, and second, to the payment of all other of the Sprague liabilities. And other creditors are now prosecuting suits for the purpose of impeaching the deeds in question. These facts clearly show that the assent of the Franklin Institution for Savings to the deed of assignment from the A. & W. Sprague Manufacturing Company to Chafee, cannot be presumed upon the ground of its being beneficial to it or to the creditors generally. It is equally clear that the presumption of assent to that deed cannot arise from the assent given by that institution to the mortgage deed. The provision in the deed of assignment which exempts the trustee from liability for losses happening to the trust estate from the running of the mills and print works of the company while under his care, management and control, is so widely variant from the terms and conditions of the mortgage deed, and so directly in conflict with them and with the law against fraudulent conveyances, that such presumption, if it could possibly arise, was thereby conclusively repelled. The relation of the institution for savings to the deed of assignment is thus conclusively shown to be that of a non-assenting creditor. It is also shown that the mortgage deed conveyed to Chafee no title to, or interest in, the property in controversy; that the title and the only title he has or ever has had to that property was derived from the deed of assignment, (which fully explains Chafee's possession of and acts of ownership over the property); and that that deed was fraudulent and void as against non-assenting creditors. The right of Mr. De Wolf, the former receiver, as the representative of the Institution for Savings and its depositors, to impeach the deed and to commence and prosecute this action to make the impeachment effective, cannot, upon these facts, justly or rightfully be questioned; and the right of the present plaintiff as his successor to continue to

Greene *v.* Sprague Manufacturing Co.

prosecute the action for the same purpose to final judgment, is equally unquestionable.

For these reasons I am of opinion that the plaintiff is entitled to judgment of foreclosure for the full amount of his lien, and that the Superior Court should be so advised.

GRANGER J., concurred in this opinion